# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38766**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jared M. BARD**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Review of Petition for Relief Referred by The Judge Advocate General
pursuant to Article 69(d)

Decided 18 April 2018

————————————

*Military Judge:* Shaun S. Speranza.

*Approved sentence:* Restriction to the limits of Dover Air Force Base,
Delaware, for 2 months, reduction to E-4, and a reprimand. Sentence
adjudged 20 November 2014 by GCM convened at Dover Air Force
Base, Delaware.

*For Appellant:* Major Patrick A. Clary, USAF; Kirk Sripinyo, Esquire.

*For Appellee:* Lieutenant Colonel G. Matt Osborn, USAF; Major Tyler
B. Musselman, USAF; Major Mary Ellen Payne, USAF; Gerald R.
Bruce, Esquire.

Before MAYBERRY, HARDING, and BENNETT, *Appellate Military
Judges.*

Judge BENNETT delivered the opinion of the court in which Chief
Judge MAYBERRY and Senior Judge HARDING joined.

————————————

**This is an unpublished opinion and, as such, does not serve as
precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

BENNETT, Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of one specification of aggravated sexual assault, one specification of indecent act, and one specification of forcible sodomy, in violation of Articles 120 and 125 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925. The court-martial sentenced Appellant to restriction to the limits of Dover Air Force Base, Delaware, for 2 months, reduction to E-4, and a reprimand. The convening authority approved the adjudged sentence.

Appellant asserts three assignments of error: (1) Whether the evidence is legally sufficient to support Appellant's convictions; (2) Whether the military judge abused his discretion when he refused to compel the production of a defense witness; and (3) Whether it was plain or manifest error when the military judge admitted the DNA evidence in this case and the expert testimony based on that evidence. We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant and the victim, JB, were first cousins vacationing in separate cottages at a lake in Maine. During the afternoon of 26 May 2012, JB joined Appellant and two other Airmen, MF and MG, for a pontoon boat cruise on the lake. While on the boat, the group drank beer and shots of alcohol. Later, JB and her father, WB, had dinner at Appellant's parents' cottage. As the evening progressed, the drinking continued, and everyone became increasingly intoxicated. Appellant appeared to be the most intoxicated.

Throughout the day, JB engaged in flirtatious behavior. For instance, she openly commented about the apparent size of MF's penis and invited him to fondle her breasts. At one point, JB told Appellant that she would have sex with him but for the fact that he was her cousin. At trial, JB explained that she made these comments in jest and did not intend for them to be considered invitations to have sex.

After dinner, Appellant, JB, and MF congregated around a fire pit to continue their drinking and carousing. Appellant drunkenly attempted to kiss JB on the cheek and mouth. While JB thought Appellant was attractive, she denied wanting to have any romantic involvement with him because they were biologically related. Eventually, weary of having to push Appellant away, JB decided to retire for the evening. At that time, she had consumed as many as ten beers and six shots of alcohol.

JB went to sleep with her clothes on, but she woke up naked with Appellant on top of her. Appellant was penetrating her vagina with his penis and

repeatedly saying, "oh baby." At the same time, MF was inserting his penis into JB's mouth. Appellant then performed oral sex on JB and eventually switched positions with MF, inserting his penis into JB's mouth as MF engaged in vaginal intercourse with her.

Other than preventing MF from attempting to have anal sex with her, JB did nothing to resist. JB described feeling like she was observing the scene from a position above, unable to move or speak. Regardless, JB unequivocally testified that she did not consent to any of this sexual activity.

The next morning, JB woke up on the floor in front of the couch, naked except for the tee shirt she was wearing. Appellant was sleeping on the couch next to her. She climbed into bed with MF, and when they awoke JB asked MF to help her find her missing clothes. Appellant was gone.

After she dressed, JB found WB. WB testified that something seemed different about JB, who demanded to be taken home. Once back at her father's cottage, JB called her close friend DS and confided in her that she had been sexually assaulted by two men. JB had not mentioned it to her father because she was embarrassed. After speaking with DS, JB told her aunt JC about the sexual assault and agreed to go to the hospital for an examination.

MF testified that he and JB had consensual oral and vaginal sex, in multiple positions, on the couch and the floor in front of the couch. According to MF, at one point, Appellant briefly entered the room, but was never a party to the intercourse.

## II. DISCUSSION

### A. Legal Sufficiency of the Evidence

Appellant argues that the evidence is legally insufficient to support his findings of guilt to all three offenses.[1] We disagree.

"The test for legal sufficiency is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (quoting *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002)), *aff'd, United States v. Wheeler*, ____M. J. ___, No. 17-0456, slip op. at 8 (C.A.A.F. 22 Mar. 2018). Beyond a

---

[1] This case was referred to this court by The Judge Advocate General under the provisions of Article 69(d), UCMJ, 10 U.S.C. § 869(d). Therefore, this court may take action only with respect to matters of law. *See* Article 69(e), UCMJ.

reasonable doubt "does not mean that the evidence must be free from conflict." *Wheeler*, 76 M.J. at 568 (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

In order for Appellant to be found guilty of aggravated sexual assault, the Government was required to prove beyond a reasonable doubt that Appellant engaged in a sexual act with JB and did so when JB was substantially incapable of declining participation in the sexual act.

In order for Appellant to be found guilty of the indecent act, the Government was required to prove beyond a reasonable doubt that Appellant engaged in certain wrongful conduct, specifically sexual intercourse in the presence of MF, and that the conduct was indecent.[2]

In order for Appellant to be found guilty of forcible sodomy, the Government was required to prove beyond a reasonable doubt that Appellant, on divers occasions, committed sodomy with JB and did so by force and without the consent of JB.[3]

Appellant cites numerous reasons for his claim that the evidence lacked legal sufficiency. First, he argues that JB was not a credible witness because she contradicted herself, suffered from cognition and memory problems, and had a financial motive to lie about the crimes of which Appellant was convicted.

JB described her sexual assault to multiple people starting with her friend DS, her aunt JC, and the sexual assault nurse examiner (SANE) who examined her the morning after the event. Not all of JB's statements concerning the sexual assault were consistent. However, any inconsistencies in JB's statements were brought into focus for the members, through direct and cross-examination, giving them an opportunity to evaluate the inconsistencies in conjunction with the rest of the evidence that was adduced at trial.

The first person JB confided in was her friend DS, whom she called the morning after the sexual assault. According to DS, JB was very upset, but also very detailed. JB told DS that two men assaulted her, that she attempted to defend herself and yelled at the men to stop, but was unsuccessful. This version of the events was inconsistent with JB's testimony insofar as it re-

---

[2] The specification of aggravated sexual assault and the specification of indecent act reflect the version of Article 120, UCMJ, in effect on 26 May 2012. *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), App. 28, at A28–13 and –16.

[3] 2012 *MCM*, pt. IV, ¶ 51.b.

ferred to her attempt to resist. At trial, JB described being in shock, feeling like she was not in the room or in a position above, and as though she could not speak. According to her testimony, she did not resist or move. There was testimony that JB suffered from cognition and memory problems that were made worse when she was drinking alcohol; however, she had no trouble remembering the salient details of her sexual assault, even if she initially claimed that she tried to defend herself.

JB testified that prior to this May 2012 sexual assault she made an application with the Commonwealth of Pennsylvania for financial benefits citing depression caused by other sexual assaults. She specifically testified that she did not make this application in order to gain any financial benefits that might be available to her as the victim of sexual assault. JB's application was denied for reasons unknown, but she made another application, prior to the trial, for financial benefits citing the May 2012 sexual assault as part of the basis for her request. As for any financial motive JB may have had to lie about the sexual assault in this case, the connection between the application process for her financial benefits and her allegations or Appellant's conviction is unclear. There is no evidence in the record that one process had anything to do with the other. In other words, there is no evidence that the allegations or Appellant's conviction would improve JB's chances of being granted financial assistance. Nor is there any evidence that JB felt she was generally in a better position to make a claim for financial benefits after her May 2012 sexual assault. She had already been rejected once after claiming that she suffered depression stemming from other sexual assaults. Furthermore, she testified that no one told her that, as a victim of sexual assault, she would be granted financial benefits.

Next, Appellant avers that JB's testimony was contradicted by MF, a Government witness with superior credibility. For this appeal, the key distinction between MF's and JB's testimony is that MF testified that he alone had consensual sex with JB and that Appellant did not participate at all. In assessing the credibility of MF's and JB's testimony, the panel members obviously found JB's version of the facts to be more believable. Based on all the evidence, particularly JB's clear and unwavering testimony, this was not an unreasonable assessment.

Finally, Appellant asserts that some of the forensic evidence in this case is not credible because it was not properly documented or processed and was unreliable. Appellant notes that the report prepared by the SANE was missing half of its pages, the forensic chemist lost her certification right before

trial, and the forensic DNA analyst found female DNA in the sperm fractions of the DNA samples she tested.[4]

The SANE prepared a report to document her physical examination of JB. This report was admitted into evidence, without objection by the Defense, despite the fact that it was missing every other page. The report was missing pages as a result of an administrative error made when the original report was scanned as a one-sided instead of two-sided document, and saved as an electronic file. The most significant consequence of this error was that the SANE, who had noted a small abrasion on JB's labia minora, could not testify about the abrasion's location because the diagram depicting this injury was on a missing page. However, the SANE testified that this abrasion was the only physical abnormality she noted during her examination of JB, and that it could have been caused by anything, including consensual sex or wiping too hard. After concluding her full body examination of JB, the SANE could not tell whether JB had sex or not, let alone whether it was consensual or nonconsensual.

AG was the forensic chemist who testified at Appellant's trial about the identification of biological evidence in this case. She was not board certified, nor was she required to be, but her laboratory was accredited by the American Society of Crime Laboratory Directors. Shortly before Appellant's trial, AG made a sampling error on a proficiency test, which was totally unrelated to Appellant's case. This mistake resulted in her being removed from sexual assault cases by her laboratory pending the outcome of an investigation. However, in 2012 when she conducted her chemical analysis for this case, she was in full compliance with all the laboratory's proficiency requirements.

As a result of AG's chemical analysis of clothing and swabs taken as evidence during the investigation, semen and sperm were found on an athletic sock and a pair of shorts. Epithelial cells, not belonging to JB, were found on the external genitalia swabs taken from JB, and sperm was found on her external genitalia, vaginal, and cervical swabs.

---

[4] The fact that female DNA was found in the sperm fractions was readily explained as typical DNA carry over during the testing process. When the number of sperm in a given sample is low, as it was in this case, it is very difficult to achieve perfect separation of the male and female DNA. Such separation is harder in cases like this because the DNA evidence was collected from the female victim and the number of female epithelial cells is overwhelming in comparison to the male epithelial and sperm cells. The fact that female DNA was found along with the sperm fractions is, therefore, not indicative of faulty DNA analysis.

CW was the forensic DNA analyst who analyzed the DNA evidence in this case and testified at Appellant's trial. She testified that the sperm found on the athletic sock matched MF's DNA profile. Furthermore, some of the epithelial cells taken from JB's external genitalia swabs matched Appellant's Y-STR DNA profile, but these epithelial cells would also match the Y-STR DNA profiles of all the males on the paternal side of Appellant's family as well as 1 in 12 Caucasian or 1 in 36 African American males.

These cells did not match MF's Y-STR DNA profile. However, CW testified that DNA can be transferred among multiple persons or objects. For example, the cells may have been shed onto the couch or the floor where the sexual activity occurred and transferred between persons and objects. Moreover, the epithelial cells may have been shed by someone with a matching Y-STR DNA profile other than Appellant.

Concerning the sperm taken from JB's cervical swab, there was a mixture of Y-STR DNA profiles. But, due to the complexity of the mixture, no comparison could be performed. Thus, CW could not establish the original sources of the sperm, only that the sperm of two males was present in the sample taken from the cervical swab. Additionally, a minor DNA profile was obtained from the sperm fraction of the cervical swab, but CW found the profile to be insufficient to compare to any known samples. So, she was unable to draw any conclusions about the DNA donor for the minor profile. MC, the forensic biologist testifying on behalf of the defense, on the other hand, testified the data provided by this minor profile was sufficient to exclude Appellant as the donor of the DNA.

To successfully make his legal sufficiency argument, Appellant must meet a high standard of review because the question for this court is whether "a reasonable factfinder *could have found* [him guilty of] all the essential elements beyond a reasonable doubt." *Wheeler*, 76 M.J. at 568 (emphasis added) (citations and internal quotation marks omitted). At trial, JB did not waiver in her testimony that Appellant penetrated her vagina with his penis, performed oral sex on her, placed his penis in her mouth, and did these things in the presence of MF. Moreover, JB consistently claimed that she did not consent to any of this sexual activity. Under our standard of review for legal sufficiency, JB's testimony is, by itself, enough to sustain the court-martial's findings of guilt. The rest of the evidence adduced at trial, even after we take into account any weaknesses or inconsistencies, largely corroborates JB's account, particularly when we consider it, as we must, in a "light most favorable to the prosecution." *Id.* (quoting *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002)). We find that a reasonable factfinder could have found Appellant guilty, beyond a reasonable doubt, of all the essential elements of

the offenses for which he was convicted. Therefore, the evidence of Appellant's guilt to all three offenses is legally sufficient.

**B. Military Judge Denial of Motion to Compel Witness Production**

Appellant argues that the military judge abused his discretion when he denied the Defense motion to compel SB, a witness whose testimony the Defense claimed would demonstrate Appellant's lack of consciousness of guilt or, put another way, his consciousness of innocence. We disagree.

A military judge's ruling on a motion to compel a witness is reviewed for an abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 1999) (citing *United States v. Rockwood*, 52 M.J. 98, 104 (C.A.A.F. 1999)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

All parties to a court-martial have an "equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Article 46, UCMJ, 10 USC § 846. "Each party is entitled to the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary." Rule for Courts-Martial (R.C.M.) 703(b)(1).

At trial, the Defense proffered that SB, who was JB's stepmother, had a telephone conversation with Appellant after the sexual assault. According to the Defense, SB would testify that based on the statements made by Appellant during that phone call, he seemed oblivious to the fact that JB had accused him, in addition to MF, of sexually assaulting her. In reliance on R.C.M. 703(b)(1), the Defense argued that SB was a "relevant and necessary" witness because her testimony was evidence of Appellant's lack of consciousness of guilt.

In his ruling, the military judge made the following findings of fact:

> On 27 May 2012, [Appellant] called [SB], who was in Pennsylvania at this time. [Appellant] and [SB] had a telephone conversation. [Appellant] told [SB] that [JB] had consensual sex with MF and now [JB] was claiming she was raped. [SB] interrupted [Appellant] and told him that if a woman says she was raped, it is rape, or words to that effect. [Appellant] explained to [SB] that [JB] made advances to [MF]. [Appellant] expressed concerns about [MF's] career, but [SB] responded that she did not care. [Appellant] stated to [SB] that this was a "he said/she said" case. [SB] told [Appellant] that an investigation would oc-

cur and the facts would be uncovered. [SB] then told [Appellant] that she had to hang up and call [her husband, WB] to find out what happened. After [SB] hung up the phone, [Appellant] tried to call her back two times.

Ultimately, the military judge ruled that the Defense failed to show, by a preponderance of the evidence, that SB's testimony was "relevant and necessary" because there was no support for a finding that Appellant's statements demonstrated consciousness of innocence or any particular state of mind.[5]

A ruling that denies a witness should be reversed only if, "on the whole," denial was improper. *McElhaney*, 54 M.J. at 126 (quoting *United States v. Ruth*, 46 M.J. 1, 3 (1997)). Moreover, a military judge's denial of a witness request will not be reversed "unless [a court of appeals has] a definite and firm conviction that the [military judge] committed a clear error of judgment in the conclusion [he or she] reached upon a weighing of the relevant factors." *Id.* (citing *United States v. Houser*, 36 M.J. 392, 397 (CMA 1993)).

The military judge did not abuse his discretion in ruling that SB's testimony was not relevant and necessary.[6] SB was in no position to observe Appellant as he made his statements because their conversation took place over the phone; SB could not assess Appellant's demeanor. Appellant argues that he would not have called SB, but for the fact that he believed he was innocent. However, when Appellant and his family initially learned of the allegations, it was unclear who had been accused. Appellant may have been probing SB to learn whether he had been implicated. It is just as plausible that Appellant's conversation with SB and his subsequent attempts to reach her after she hung up demonstrated his consciousness of guilt not his consciousness of innocence. Thus, we find Appellant's argument to be unpersuasive.

We find that SB's testimony concerning her phone call with Appellant would not have made it more probable that Appellant believed he was innocent. SB's testimony was not relevant and necessary. The military judge's findings of fact were not clearly erroneous, he was neither incorrect about the applicable law, nor did he incorrectly apply the law. Therefore, we find that

---

[5] The military judge specifically stated, "there are no statements even proffered by the Defense that support its theory of the evidence's materiality, namely that the statements were indicative of a consciousness of innocence or state of mind."

[6] Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Mil. R. Evid. 401.

the military judge did not abuse his discretion when he denied the Defense motion to compel SB.

## C. Admission of DNA Evidence and Associated Expert Witness Testimony

Appellant argues that it was plain and "manifest error"[7] for the military judge to admit the SANE's testimony and report, the DNA evidence, and the related expert testimony presented by the Government. To support his argument, Appellant claims, among other things, that the SANE's testimony was not sufficiently based on fact and that her report, or what was left of it, was incomplete. Thus, it was not possible to determine whether the SANE had collected the evidence in a way that was scientifically reliable. Appellant also avers that the DNA evidence was itself unreliable; its collection improperly documented; its handling, processing, and evaluation questionable; and the presentation of the DNA evidence misleading. We disagree.

At trial, the Defense did not object to the SANE's report or testimony, nor did the Defense object to the qualifications or testimony of the two forensic DNA experts who testified about the identification and analysis of the biological evidence collected in this case. Because Appellant failed to object to this evidence at trial, we review for plain error. To establish plain error, Appellant must prove: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007).

To begin with, Appellant's conflation of the fact that JB's sexual assault examination report was missing pages with his argument that the DNA evidence and expert testimony were unreliable is not compelling. The fact that the report was incomplete does not mean the sexual assault examination was improperly conducted, nor does it prove that the DNA or other physical evidence was improperly collected.

The SANE who examined JB and collected some of the DNA evidence used in this case provided ample detail concerning the methodical approach she took. In addition to her physical examination of JB, the SANE explained how she took swabs of JB's nose, mouth, external genitalia, vagina, cervix, and anus. The SANE also took fingernail clippings and combed JB's pubic hair. Moreover, the record contains additional evidence showing that JB's DNA evidence was properly collected, handled, and maintained. This includes

---

[7] Appellant relies on *United States v. Henning*, 75 M.J. 187, 191 (C.A.A.F. 2015) to assert this proposition.

photos of the evidence collection kit used by the SANE and a complete chain of custody document. Thus, the record establishes that the SANE properly collected and handled the DNA evidence, and the military judge did not commit error, plain or otherwise, by admitting the SANE's testimony or her sexual examination report.

AG was the forensic chemist, employed by an accredited crime laboratory, who identified the epithelial cells as well as semen and sperm cells on various pieces of evidence, including clothing and the external genitalia, vaginal, and cervical swabs taken by the SANE. Her normal forensic duties involved examining evidence for biological fluids like blood, semen, and saliva as well as hair and fibers. After providing her curriculum vitae and testimony concerning her professional background, which included 16 years of experience in forensic science and analyzing thousands of samples of evidence in 287 sexual assault cases between 2010 and 2014, she was recognized by the military judge as an expert in forensic chemistry.

AG conducted her forensic analysis of the evidence collected for this case in 2012, and she testified about the methods she employed and the report she generated as a result of her analysis. However, shortly before the trial started in 2014, she failed to identify sperm cells in a proficiency test given by her laboratory.[8] This led to her temporary suspension from sexual assault case work pending the outcome of an investigation into her sampling error, but, when she conducted her forensic examination of the evidence in this case, AG was fully proficient.[9] AG's 2014 sampling error is unfortunate, but it amounts to the only evidence of AG having any proficiency problem over the course of a lengthy career in forensic science and, most importantly, it had nothing to

---

[8] For this proficiency examination, AG was asked to identify biological fluids from a cutting she had taken from some stained fabric. She identified human blood as well as Prostate Specific Antigen (PSA). PSA is an enzyme present in semen, but AG found no sperm cells. When it was discovered that AG obtained results that differed from other examiners who were given the same test, she was asked to analyze the remainder of the stained fabric. After doing so, she did identify sperm cells. According to AG's testimony, the reason she failed to identify sperm cells during her first attempt was because there were none present on the cutting she had taken. This was considered a sampling error because her cutting did not contain all the biological deposits she was supposed to identify for this test. This type of error is considered less serious than a contamination error.

[9] AG was not board certified and her laboratory did not require it.

do with her forensic analysis in this case.[10] Moreover, in the time leading up to the trial, she had passed other proficiency tests.

CW worked for the same laboratory as AG. She was the forensic DNA analyst who determined, among other things, that the epithelial cells taken from JB's external genitalia swabs, the ones identified by AG, matched Appellant's Y-STR DNA profile. At the time of trial, she had passed all her competency and proficiency examinations, she had worked in forensic sciences for approximately ten years, including performing forensic DNA analysis in approximately 1400 cases, with more than 100 being sexual assault cases. After providing her curriculum vitae and testimony concerning her professional qualifications, she was recognized as an expert in forensic DNA examination and forensic biology.

After providing comprehensive testimony about her scientific analysis in this case, CW admitted that she could match none of the semen or sperm found on any of the evidence to Appellant. According to CW, the epithelial cells found on JB's external genitalia swab with a Y-STR DNA profile consistent with Appellant's amounted to the only DNA evidence that arguably linked Appellant to the sexual assault. However, as CW explained, these epithelial cells would also match the Y-STR DNA profiles of all the males on the paternal side of Appellant's family, as well as 1 in 12 Caucasian or 1 in 36 African American males. Moreover, the transfer of these cells to JB did not require skin to skin contact between her and Appellant, or anyone else. For instance, the cells could have been transferred to JB from a sofa cushion. Thus, the epithelial cells may have been shed by Appellant or someone else and could have been transferred to JB through direct or indirect contact.

In *United States v. Youngberg*, the CAAF held that DNA testing and its underlying statistical analysis are sufficiently reliable and "admissible at courts-martial if a proper foundation is laid." 43 M.J. 379, 386 (C.A.A.F. 1995); *see also United States v. Allison*, 63 M.J. 365, 369 (C.A.A.F. 2006). We find that a proper foundation was laid for the use of DNA evidence in this

---

[10] As a result of AG's proficiency error, her laboratory initiated a review of the work that she had performed in six cases. Notably, the laboratory chose to review only cases from the year prior to AG's failed test. Her analysis in this case occurred almost two years prior. The laboratory's decision to review cases from the preceding year only, without delving deeper, is a fact that further attenuates any concern we might have that her lone proficiency failure called into question her methods, her ability to explain them, or the results she obtained.

case; the DNA evidence was properly collected, handled, and evaluated. This evidence was reliable, and its related testimony was not misleading.

Mil. R. Evid. 702 allows an expert to provide a professional opinion, assuming the individual is qualified, if the following criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

We find both experts were qualified and that each of the Mil. R. Evid. 702 criteria were met. A proper foundation was laid for the recognition of AG and CW as expert witnesses. The military judge did not commit error, plain or otherwise by recognizing AG and CW as experts in their fields, or by allowing them to testify concerning their professional opinion at Appellant's court-martial.

Although we found the military judge did not err by admitting the SANE's testimony, her sexual examination report, the DNA evidence, or the related expert testimony; even if there was error, it was harmless. Under these circumstances, the test for prejudice is whether the error materially prejudiced a substantial right of Appellant. Article 59(a), UCMJ, 10 U.S.C. § 859(a). In evaluating this question, we use a four-part test, "weighing: (1) the strength of the Government's case, (2) the strength of the Defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Berry*, 61 M.J. 91, 98 (C.A.A.F. 2005)."

JB's unequivocal testimony concerning the sexual assault was, by itself, enough to prove beyond a reasonable doubt that Appellant was guilty of all the offenses. In addition to JB, the Government also called, among others, DS, WB, and SC, each of whom provided testimony that corroborated JB's testimony. The Government's case, excluding the forensic evidence, was strong.

In comparison, the defense case was weak. It relied primarily on the testimony of MC, a forensic biologist who attempted to refute the Government's forensic experts and Dr. JM, a forensic psychologist who testified about alcohol's effect on the memory. Specifically, he testified that JB's testimony about the event was consistent with someone who suffered from an alcohol related

"blackout," and it was possible that since she could not remember what happened during the "blackout" JB was filling the gaps in her memory with "pseudomemories." Given the strength of JB's detailed account of the event, we find it unlikely that she suffered a "blackout." The Appellant did not testify, but his friend MF, who was actually called as a witness by the Government, testified that he alone had consensual sex with JB, and that Appellant merely entered the room at one point.

We find nothing in the record that causes us to question the quality of the forensic evidence. This evidence, to the extent that it corroborated JB's testimony, was material. However, the Government's findings case certainly did not hinge on this evidence. The SANE testified that JB's physical examination yielded no evidence that proved she had sex, let alone nonconsensual sex. The epithelial cells found on JB's external genitalia swab arguably link Appellant to the sexual assault, but they also link any male on the paternal side of his family, as well as others, to the sexual assault. Furthermore, these cells could have been transferred through indirect contact. None of the other DNA evidence linked Appellant to the sexual assault. The physical evidence, including the evidence that there were two separate sources of semen, may have been corroborative of the fact that Appellant sexually assaulted JB, but was far from conclusive. In the end, the government's case, even without the forensic evidence, was simply too strong for the defense to overcome. Therefore, even if there were error, it did not prejudice Appellant.

## III. Conclusion

The findings and sentence are correct in law, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 69(e), UCMJ, 10 U.S.C. §§ 859(a), 869(e). Accordingly, the findings and sentence are **AFFIRMED.**

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

14