*Corrected Copy as of 9 October 2018*

# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

**No. 201300311**

————————————

**UNITED STATES OF AMERICA**
*Appellee*

**v.**

**Pedro M. BESS**
Hospital Corpsman Second Class (E-5), U.S. Navy
*Appellant*

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Heather Partridge, JAGC, USN.
For Appellant: Lieutenant Commander Jacob E. Meusch, JAGC, USN.
For Appellee: Captain Brian L. Farrell, U.S. Marine Corps; Captain Sean M. Monks, U.S. Marine Corps.

————————————

Decided 4 October 2018

————————————

Before WOODARD, FULTON, and JONES,
*Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————

JONES, Senior Judge:

This case is before us for a second time. On 8 March 2013, the appellant was convicted of two specifications of attempting to commit an indecent act and four specifications of committing indecent acts, in violation of Articles 80

*Hyperlink removed from page 13.*

and 120, (UCMJ), 10 U.S.C. §§ 880 and 920 (2007).[1] On 28 October 2014, we affirmed the findings and sentence.[2] On 6 January 2016, the Court of Appeals for the Armed Forces (CAAF) held that the military judge erred by denying the appellant an opportunity to impeach evidence requested by the members during deliberations. The CAAF set aside the findings and sentence and remanded the case with authorization for a rehearing. *United States v. Bess*, 75 M.J. 70 (C.A.A.F. 2016). The results of that rehearing are before us now.

On remand, a general court-martial consisting of members with enlisted representation convicted the appellant, contrary to his pleas, of two specifications of indecent acts in violation of Article 120, UCMJ.[3] The convening authority (CA) approved the adjudged sentence of confinement for one year, reduction to pay grade E-3, and a reprimand.

The appellant raises ten assignments of error (AOEs), which we have reordered: (1) the appellant's convictions for indecent acts are legally and factually insufficient; (2) the government violated his due process rights in failing to notify him that he was being held on active duty beyond the end of his active duty service obligation; (3) the military judge erred by denying his request for the production of a witness; (4) the military judge abused her discretion by denying production of a statistical breakdown of the racial make-up of the population within the CA's pool of potential members; (5) the military judge violated the Equal Protection Clause of the Constitution by failing to require a race-neutral reason for the CA's exclusion of black members from the appellant's venire; (6) the CA engaged in unlawful command influence (UCI) by excluding black members from the venire; (7) the military judge abused her discretion by denying the appellant's motion for a mistrial; (8) the government illegally punished the appellant by taking his uniforms after his first trial; (9) the panel violated his due process rights because it consisted of less than six members, and their verdict did not require unanimity; and (10) the guilty verdict should be set aside and dismissed under the cumulative error doctrine.

---

[1] *United States v. Bess*, No. 201300311, 2014 CCA LEXIS 803 (N-M. Ct. Crim. App. 28 Oct 2014) (unpub. op.).

[2] *Id.*

[3] The appellant was acquitted of two other specifications involving similar crimes on separate alleged victims: one specification of Article 80, UCMJ, 10 U.S.C. § 880 (2007), and one specification of Article 120, UCMJ, 10 U.S.C. § 920 (2007).

We have considered AOEs nine and ten, and find them to be without merit.[4] Having carefully considered the remaining AOEs, the record of trial, and the parties' submissions, we conclude the findings and sentence are correct in law and fact and that no error materially prejudiced the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## I. BACKGROUND

The appellant is an African-American x-ray technician who was assigned to the Naval Air Station Oceana Branch Health Clinic (Oceana Clinic), Virginia Beach, Virginia. While in the performance of his duties at the clinic in February 2011, the appellant told two female patients, PG, the dependent daughter of an active duty field grade officer, and Aviation Support Equipment Technician (Mechanical) Petty Officer 2nd Class (ASM2) AL, that they had to be naked while he took their x-rays. Both women complied by removing their clothing, and the appellant purportedly took x-rays of them.[5] At trial, Dr. B, a radiologist, testified that patients are never required to be naked for any type of x-ray.

## A. PG

On 24 February 2011, PG's doctor ordered x-rays from the Oceana Clinic because PG was having back and neck pain after a car accident. When PG went to the x-ray room, she met two people, an "older white gentleman" and

---

[4] *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992). It is settled law that a five-member court-martial panel does not violate due process. *See United States v. Wolff*, 5 M.J. 923, 925 (N.M.C.M.R. 1978) (holding there was no due process deprivation for a five-member panel in the military, in spite of the Supreme Court's ruling in *Ballew v. Georgia*, 435 U.S. 223 (1978) which required juries of at least six members in Article III courts); Article 16, UCMJ; 10 U.S.C. § 816. It is also settled law that the panel's vote need not be unanimous. *See* Article 52(a)(2), UCMJ; 10 U.S.C. § 852(a)(2). *See also United States v. Matias*, 25 M.J. 356, 361, (C.M.A. 1987).

When an accumulation of errors deprives an appellant of a fair trial, Article 59(a), UCMJ, compels us to reverse it. *United States v. Banks*, 36 M.J. 150, 171 (C.M.A. 1992). Here, given our findings on the other AOEs, the cumulative error doctrine is inapposite.

[5] We say "purportedly" because no x-rays of the women nude were found during the investigation. At trial, a radiology technician testified that it is possible for a technician to cause the x-ray machine to make sounds without actually capturing an image. Also, x-rays not sent to doctors were automatically and systematically purged from the Oceana Clinic's computers.

the appellant.[6] The older gentleman and the appellant conducted chest x-rays of PG while she was wearing jeans and t-shirt, but with her bra removed.[7]

After these initial x-rays, the older gentleman left. The appellant then told PG that he needed to take more x-rays because she was in a head-on collision and he instructed her to get completely undressed. The appellant left the room. PG did as she was directed and lay on the table completely naked. The appellant returned and appeared to take x-rays of PG in several positions while she was completely naked. These positions included having PG lay on her stomach and stick her buttocks in the air and get into a "frog-like position."[8] The positions completely exposed PG's naked vaginal area to the appellant. During this time, PG was never given a gown or other clothing to wear, and had only a small cloth that she tried unsuccessfully to use to cover her breasts and genitalia. Finally, PG asked if they had to continue taking more x-rays, and the appellant said he would "check with [her] doctor."[9] The appellant left the room and returned a few moments later to tell PG she could leave.

**B. ASM2 AL**

ASM2 AL's flight surgeon ordered x-rays for her back. On the morning of 25 February 2011, ASM2 AL went to the x-ray department at the Oceana Clinic and a female technician took x-rays of her back while she was lying down. ASM2 AL remained fully clothed during this procedure. Later that evening, she was instructed to return to the Clinic's x-ray department because her doctor needed x-rays of her back "taken standing up."[10]

When ASM2 AL went back to the x-ray room with the appellant, he instructed her to remove her clothing and wear nothing except a gown. After she had changed, the appellant came back into the room and told her that "the doctor had requested that [she] wear nothing and that [she] be complete-

---

[6] Record at 504-05.

[7] At trial, PG was cross-examined on her October 2011 statement to NCIS, where she stated that the older gentleman was present during the original x-rays and that she was topless at that time. *Id.* at 526-27. On re-direct examination, PG reiterated that—in spite of what the NCIS agent had written—she was naked only during the second set of x-rays when she and the appellant were alone in the room. *Id.* at 532-33.

[8] *Id.* at 515-16.

[9] *Id.*

[10] *Id.* at 341-42; Prosecution Exhibit (PE) 20.

ly nude to take the x-rays.”[11] The appellant left the room again and she took off the gown as directed, leaving her completely naked. When the appellant returned, he had ASM2 AL sign a consent form which appeared to be “a statement from [her doctor] saying that [she] had to be nude for the x-rays so that they would show up more clear [sic].”[12] The appellant then took a series of x-rays while she was standing and completely naked. Throughout the entire process, ASM2 AL’s breasts, buttocks, and vaginal area were exposed, and the appellant encouraged her not to cover her pelvic area with her hands.

Additional facts necessary to resolution of the AOEs are included below.

## II. DISCUSSION

### A. Legal and factual sufficiency

The appellant argues that the evidence is legally and factually insufficient to find him guilty of both specifications of indecent conduct. We disagree.

We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether “after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant’s guilt beyond a reasonable doubt.” *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take “a fresh, impartial look at the evidence,” applying “neither a presumption of innocence nor a presumption of guilt” to “make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.” *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001). “The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *Rosario*, 76 M.J. at 117).

The appellant disputes only his identification as the perpetrator. He avers that “the government failed to prove beyond a reasonable doubt that [he] was

---

[11] Record at 343.

[12] *Id.* at 347.

the performing [x-ray] technician."[13] Therefore, we will focus on the government's burden to prove beyond a reasonable doubt that it was the appellant that committed the indecent acts of unlawfully viewing the nude bodies of PG and ASM2 AL during their x-ray examinations.[14]

Of the five x-ray technicians at the Oceana Clinic, only two would appear to be black. One was the appellant; the other was a native of Haiti, and spoke with a "really thick" accent.[15] In addition to his accent, the other technician was readily distinguishable from the appellant—he was tall and thin, and had a dark-complexion. The appellant was comparatively stockier and had a lighter complexion. The other technician was a third class petty officer. The victims testified that their technician was a second class petty officer, like the appellant.

Both victims had ample opportunity to both observe the appellant's physical description and clearly hear his voice while they were alone in the x-ray room with him. Both spent several minutes talking to the appellant while he pretended to provide them with medical care. Neither victim testified that the x-ray technician that made them remove all of their clothes had an accent. At trial, PG and ASM2 AL positively identified the appellant as the x-ray technician who took their x-rays while they were nude.

---

[13] *Id.* at 504-14; Appellant's Brief of 1 Dec 2017 at 59.

[14] The elements for the indecent acts alleged in Specification 1 of Charge II are:

(1) The appellant engaged in wrongful conduct by wrongfully and without necessity having PG remove all of her clothing in order to receive an x-ray examination and having her lay on an examination table with her legs splayed, knees bent, and feet together while she was nude and on her stomach with her back arched and hips propped up while she was nude and thereby observing her genitalia, buttocks, and nipples; and

(2) The conduct was indecent.

The elements for the indecent acts alleged in Specification 2 of Charge II are:

(1) The appellant engaged in wrongful conduct by wrongfully and without necessity having ASM2 AL remove all of her clothing in order to receive an x-ray examination and thereby observing her nude body, to include the genitalia, buttocks, and nipples; and

(2) The conduct was indecent.

10 U.S.C. § 920(k) (2007); MANUAL FOR COURTS-MARTIAL, UNITED STATES (MCM) (2007 ed.), Part IV, ¶45b.(11); Record at 803-04; Charge Sheet.

[15] Record at 409. We use the term "black" in the opinion because we are not certain the Haitian x-ray technician identifies as African-American.

The government submitted various records to corroborate that it was the appellant who took x-rays of PG and ASM2 AL while they were nude. The appellant avers that these records were unreliable. First, the government submitted documents from a medical care records system called the Composite Healthcare System (CHCS), which is used to track medical services for patients, including x-rays. Per the CHCS, PG received her x-rays between 1709 and 1751 on 24 February 2011 from the appellant.[16] Also per the CHCS, ASM2 AL received her x-rays between 1645 and 1710, and then again at 1801 on 25 February 2011 from the appellant.[17] The government also presented the appellant's unit's muster reports for the two days in question. They revealed that only one x-ray technician was on duty for both of these late shifts at the Oceana Clinic—the appellant.

The corroborating evidence from the CHCS presented by the government, however, is not infallible. Any x-ray technician had the ability to manipulate the CHCS report by simply putting a different technician's name into the system before taking an x-ray. Also, it was not uncommon for a technician to take x-rays of a patient while a different technician was logged in to the CHCS system. In this case, however, both PG's and ASM2 AL's x-rays were taken after normal working hours when the appellant was the only x-ray technician on duty, and therefore not sharing the x-ray machine with other technicians. We also accept that the unit's muster reports were not fail-safe evidence; after a muster report was taken, technicians still rotated between the Oceana Clinic and another nearby clinic based on work assignments and personal necessities. But the CHCS records, in conjunction with the appellant's unit muster reports, corroborate the victims' unwavering identification of the appellant as the x-ray technician who took their x-rays when they were nude.

We are convinced that the appellant was the x-ray technician who took PG's and ASM2 AL's x-rays while they were nude. The evidence of his guilt is overwhelming. The victims' allegations and their in-court identifications are supported by other testimonial and documentary evidence establishing that the appellant was their x-ray technician.[18] We do not believe the victims confused the appellant for any other x-ray technician working at the Oceana

---

[16] PE 12 at 4; Record at 439.

[17] PE 14 at 2; Record at 430-31.

[18] We also reject the appellant's contention that because his personal marker—a skull and crossbones with his initials—was not visible on the victims' x-rays he was not the technician who conducted the x-rays. We are not surprised that the appellant would seek to avoid identifying himself while committing crimes.

Clinic. Each victim's testimony at trial supported the charges resulting in the convictions. We find unpersuasive the appellant's argument that his identification was merely the result of government suggestibility and that the victims confused him with the other black technician. After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

## B. Failure to notify the appellant that he was on legal hold

The appellant alleges his due process rights were violated because the government failed to provide him notice that it was retaining him on active duty past his End of Active Obligated Service (EAOS) date.

After the appellant served his confinement for his first court-martial, his command failed to administratively change the expiration of his EAOS from 20 October 2016 to 20 April 2017. This change should have been made because days spent in confinement do not count towards fulfilling a service-member's enlistment.[19] On 11 April 2017, the appellant's command realized the error and issued him a counseling entry documenting that he had been on legal hold from 20 October 2016 to 11 April 2017.[20] The appellant argues this lack of notice of his legal hold violated his right to due process, and that this violation caused the court-martial to lose jurisdiction over him. We disagree.

As the appellant raises this due process concern for the first time on appeal, we apply the plain error standard. *See United States v. Lewis*, 69 M.J. 379, 383 (C.A.A.F. 2011) (applying the plain error standard to a due process claim first raised on appeal). Under the plain error standard, the appellant must show that: "(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *Id.* (quoting *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

Here, the appellant fails to show that the government's failure to provide this notification plainly or obviously violated his right to due process. The appellant cites no authority—and we find none—supporting the proposition that the government's failure to notify him that he was being retained on active duty amounted to a violation of the Fifth Amendment guarantee of due

---

[19] Appellant's Motion to Attach of 20 Nov 2017, App. 2 at 2.

[20] *Id.* at 2-3.

process. Even if it did, the record does not reveal that the appellant was actually prejudiced. The record contains no indication that the appellant did not know that he remained on active duty. He was not discharged after his first court-martial. The appellant's brief makes plain that the appellant wore a uniform and returned to active service after having been confined.

The appellant erroneously links this perceived failure of due process with jurisdiction. The appellant incorrectly concludes that "as a result of the government's failure to provide such notice, government officials were able to retain personal jurisdiction" over the appellant.[21] But notification is not the source of, and does not affect, jurisdiction over a service member. Rather, the appellant was subject to the court-martial's jurisdiction because he had never been discharged from active duty. And the record does not contain any reason to find that the appellant would have been discharged had he brought the government's error to its attention. Doubtless the government would have simply notified him that he was being retained for a second trial.

We find that the government did not violate the appellant's Fifth Amendment right to due process, and that no administrative error severed court-martial jurisdiction over the appellant.

## C. Military judge's denial of motion to produce a witness

The appellant avers that the military judge abused her discretion in denying the appellant's pre-trial motion to compel production of Investigator S as a witness at trial. We disagree.

Investigator S was an investigator for the Naval Criminal Investigative Service assigned to the appellant's case. During his investigation, Investigator S used the CHCS to identify and then cold-call numerous females who might have been potential victims of the appellant. In one of these calls, a female patient—who was never a victim in the appellant's case—indicated that her x-ray technician might have been Caucasian. This was significant because the CHCS indicated the appellant had been signed in as her x-ray technician during the taking of her x-rays. The agent noted that the patient stated her technician was "Male (Caucasian)–Not too sure."[22] The defense argued that Investigator S could testify about this phone call with the unknown female. They argued this would show the CHCS was too unreliable to identify which x-ray technician took certain x-rays.

---

[21] Appellant's Brief at 35.

[22] Appellate Exhibit (AE) VI at 6.

The military judge denied the motion, ruling that the testimony of Investigator S was not relevant or necessary. She stated that she could not "see how it is any more likely that this is a flaw in the CHCS than it is [the female patient's] memory of describing the x-ray technician."[23] The military judge found that Investigator S was cumulative with the defense's own expert consultant on the CHCS. She also found that the defense could effectively cross-examine other government witnesses with direct knowledge of the CHCS—witnesses who would readily admit that the CHCS showed only which x-ray technician was signed in at any given time and not which technician took certain x-rays.

We review witness production rulings for an abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 2000). "The military judge's decision should only be reversed if, 'on the whole,' denial of the defense witness was improper." *United States v. Ruth*, 46 M.J. 1, 3 (C.A.A.F. 1997) (citations omitted) (alteration in original). We will not reverse a military judge's ruling on a witness production motion "unless [we] have a definite and firm conviction that the [military judge] committed a clear error of judgment in the conclusion [she] reached upon a weighing of the relevant factors." *Id.* (citations and internal quotations omitted).

The test for whether a witness should be produced is whether that witness is relevant and necessary. R.C.M. 703(b)(1). To determine if the testimony would be relevant, the trial judge must consider whether the testimony would have any tendency to make a fact of consequence more or less probable, and that its probative value is not outweighed by the danger of unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence. MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 401 and 403, MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.).

To determine whether a witness is necessary, we consider such factors as the issues involved in the case and the importance of the requested witness as to those issues; whether the witness is desired on the merits or the sentencing portion of the trial; whether the witness's testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness, such as deposition, interrogatories or previous testimony. *Ruth*, 46 M.J. at 4 (quoting *United States v. Tangpuz*, 5 M.J. 426, 429 (C.M.A. 1978)).

---

[23] Record at 37.

We agree with the military judge's finding that Investigator S's testimony would have had very minimal, if any, relevance. The unidentified female patient's memory was inconclusive, and Investigator S could only speculate about what her testimony actually meant regarding the reliability of the CHCS. We concur with the military judge's finding that a faulty memory of one patient would shed little, if any, light on the trustworthiness of the CHCS.

We also conclude that the military judge did not err in finding the evidence was not necessary. Although she did not spell out all of the *Ruth* factors for determining when a witness is necessary, the military judge did address two of the factors in her ruling: She addressed the first *Ruth* factor—the issues involved in the case and the importance of the requested witness as to those issues—when she found Investigator S's testimony unimportant regarding the reliability of the CHCS. She also addressed the third *Ruth* factor—whether the witness's testimony would be merely cumulative—in finding that there were already several witnesses who were going to testify about the reliability of the CHCS. In fact, the defense conceded that the government was going to call at least three x-ray technicians who would testify that the CHCS did not always portray who a patient's actual x-ray technician was because the technicians could "select any name from the drop-down menu" when they took the x-rays.[24]

As the military judge anticipated, the issue of the CHCS's reliability was addressed by several witnesses at trial. No fewer than three government witnesses and three defense witnesses—including the appellant himself—testified regarding the reliability of using the CHCS to positively identify which x-ray technician took a certain x-ray.[25] Production of Investigator S's testimony was not necessary. Accordingly, we conclude that the military judge did not abuse her discretion in denying the production of Investigator S.

## D. Denial of discovery

The appellant asserts that the military judge abused her discretion in denying production of a statistical breakdown of the racial make-up of the population of the CA's command.

---

[24] *Id.* at 22.

[25] *Id.* at 402-79; 540-647; 675-97; 737-45; 746-78.

*1. Background*

After general voir dire, but before the first member was brought in for individual voir dire, the trial defense counsel (TDC) stated the defense team had noticed that the "the panel [was] all white," their client was African-American, and they "would prefer African-American representation on the panel."[26] The TDC indicated they were making "a combination of an Article 25 [UCMJ,] challenge . . . almost like a preventative *Batson* challenge. . . . It is almost as though a command is preventing that race from representation on the panel so that they can avoid a *Batson* challenge."[27]

The military judge responded:

> [A]bsent any evidence of anything inappropriate being done by the convening authority in assembling the panel, you know, all I can state for the record is that, if it wasn't for frankly some of—the reading that I did about the prior proceeding, I would not personally have known the race of your client, and I certainly would not know necessarily by observing him, nor do I feel confident that I know the race of several of the members of the panel. I suspect that we have some minority participation on the panel . . . .[28]

In response, the TDC stated, "I may have misspoke [sic] and said that [the panel] were all Caucasian, and that might not be true. I am fairly confident that there is no African-American on the panel of 10, which statistically speaking, you would think that there would be at least one."[29]

The TDC then requested to expand their initial discovery request—which had been for the documents accompanying the selection of members under Article 25, UCMJ—to include "a statistical breakdown of the population as far as race with respect to the convening authority's command."[30] The military judge denied the discovery request. First, she found that the defense had been in possession of the member's questionnaires for a week before trial and should have raised the issue earlier. Second, she found that a statistical breakdown of the CA's command based on race was not feasible, and was irrelevant absent any evidence of impropriety.

---

[26] *Id.* at 140.

[27] *Id.* at 141.

[28] *Id.*

[29] *Id.* at 143.

[30] *Id.* at 144.

Finally, the TDC argued that this was the second members panel in a row in which he was representing an African-American client and the members appeared to be "an all-white panel."[31] The military judge noted the TDC's objection for the record and then directed that the first member be called in for individual voir dire.

### *2. Denial of request for discovery*

We review a military judge's ruling on a request for production of evidence for an abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). The military judge abuses her discretion when her findings of fact are clearly erroneous or her ruling is influenced by an erroneous view of the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). Here, although we find the military judge erred in declaring the TDC's objection to the panel untimely, she did not abuse her discretion by denying the discovery request.

With regard to timeliness, the military judge misapprehended the content of the members' questionnaires. Only one of the ten member's questionnaires had a question asking the member to identify her race.[32] The appellant would have had no way of knowing what race the members appeared to be until they actually arrived at the trial. The military judge's finding, therefore, that the defense could have used the questionnaires to bring the motion sooner was incorrect. The defense brought the issue to the military judge's attention when it came to their attention. Our superior court has ruled that an objection that the CA selected members for reasons other than those listed in Article 25, UCMJ—such as excluding members based on race—is always timely and never waived. *United States v. Riesbeck*, 77 M.J. 154, 160 (C.A.A.F. 2018).[33]

Although the military judge erred with regard to the timeliness of the motion, we find that she did not abuse her discretion in denying the motion. First, the defense request for "a statistical breakdown of the population as far as race with respect to the convening authority's command" is not relevant. The record reveals that the CA was able to detail members from outside Navy Region Mid-Atlantic, and even from commands not subordinate to his com-

---

[31] *Id.* at 146.

[32] AE XXVVII at 76. The member with the racial identifier question self-identified as Caucasian.

[33] The CAAF equated this attack on member selection to UCI. "We also noted that improper member selection can constitute unlawful command influence, which cannot be waived." *Riesbeck*, 77 M.J. at 176. *See* Section F, *infra*.

mand. The record also reveals that no members detailed to the appellant's court-martial listed Navy Region Mid-Atlantic—the CA's command—as their current command. Knowing the racial makeup of the CA's command, therefore, would not have been useful to the court-martial.

We are unable to re-construe the request to be more relevant. The record does not reveal what additional commands made up the CA's pool of available members. We cannot know—and the appellant has not demonstrated—what a request for more relevant information might have looked like. What commands' demographic information should be used? Over what period of time? In terms of eligibility under Article 25, UCMJ, what would be the appropriate groups of people to consider? The appellant's request at trial was for irrelevant information, and the military judge did not abuse her discretion by denying it.

On appeal, the appellant asks us to re-tool the request and order a *DuBay* hearing to "require the government to produce the racial and statistical makeup of the pool of members for the CA and 'articulate[ ] a neutral explanation relative to this particular case, giving a clear and reasonably specific explanation of legitimate reasons' for excluding black members from HM2 Bess' venire."[34] We find, however, that the record is sufficient for us to determine that the military judge did not abuse her discretion by denying the request as it was made at trial. The appellant presented no evidence that the CA used anything other than the Article 25, UCMJ, criteria for selecting members, or that he even knew the race of all but one of the members he selected. The appellant's mid-voir dire request was for irrelevant information, and the military judge rightly denied it at the time. We decline the appellant's invitation to litigate new requests post-trial. This assignment of error is without merit.

**E. No African-Americans on the panel**

The appellant urges us to extend *Batson v. Kentucky*, 476 U.S. 79 (1986) and hold that the military judge erred by not requiring the CA to give a race-neutral reason for not having any African-Americans on the panel. We decline to do so.

*Batson*, as applied to the military in *United States v. Santiago-Davila*, 26 M.J. 380 (C.M.A. 1988), allows an accused to require a prosecutor to give a race-neutral reason for exercising a peremptory challenge on a minority member. The appellant argues that the CA circumvented *Batson* by not in-

---

[34] Appellant's Brief at 47 (quoting *United States v. Moore*, 28 M.J. 366, 369 (C.M.A. 1989) (alteration in original).

cluding any African-Americans on the panel. The appellant argues that the absence of African-Americans on the panel is prima facie evidence that the CA systematically excluded them, and that, under *Batson*, the burden shifted to the government—presumably the CA—to give a race-neutral reason for not including African-Americans.

There is no precedent for this application of *Batson* in courts-martial, and we decline to create it here. Additionally, we are bound by precedent that establishes that, absent further evidence of some intentional exclusion of a particular group by the CA, the absence of African-Americans on the panel does not constitute prima facie evidence of systematic exclusion. *See United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994). This assignment of error is without merit.

**F. Unlawful Command Influence**

The appellant claims that the commander exerted UCI by excluding African-American members from the panel. We disagree.

To prove UCI on appeal the appellant must show (1) facts, that if true, constitute UCI, (2) the prior proceedings were unfair, and (3) the UCI "was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994)). The appellant must show facts that, if true, allege the members were selected on an impermissible basis to affect the result of the trial. *Riesbeck*, 77 M.J. at 159. Proximate causation between the alleged UCI and court martial outcome must be proven as well. *Biagase*, 50 M.J. at 150 (citing *United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A. 1994)).

Allegations of UCI are reviewed *de novo* by this court. *United States v. Sayler*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)). The appellant alleges that the CA used race to select an all-white panel in order to engage in court stacking, a form of UCI. *Riesbeck*, 77 M.J. at 165. "The initial burden of showing potential [UCI] is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 1999). If the defense presents some evidence of UCI, the burden shifts to the government to show either that there was no UCI, or that any UCI did not taint the proceedings. *Stoneman,* 57 M.J. at 41.

We find that the appellant has not met his initial burden. With the exception of the one member's questionnaire that had a racial or ethnicity identifying question and response, there is no evidence that the CA knew the race of any of the other nine members detailed to the court-martial. Again, we observe that none of the members listed Navy Region Mid-Atlantic as their parent command on their member questionnaires. As all of the members

denied personally knowing the CA during voir dire, we have no reason to suspect that the CA personally knew them and would therefore have known their race. This court cannot even be sure of the members' race as the record is absent of any questions posed during voir dire to the members by either counsel or the military judge regarding the members' racial or ethnic background.

We note that the appellant's counsel was in possession of the matters the CA used to select members, and that he failed to introduce these matters as evidence. Also, the appellant did not call the CA as a witness to ask him about how he selected members.

We have considered the affidavit provided by trial defense counsel's executive officer. In that affidavit, the executive officer notes that he represented an African-American officer at court-martial seven months after the appellant's trial. Before that officer's trial, the executive officer sent a letter to the CA asking for minority representation at the officer's trial. The CA complied with that request. In the affidavit the executive officer goes on to state that he is aware of three other cases in which African-Americans were tried by all-white panels convened by the CA. We find that this anecdotal observation by the executive officer of a defense command, which cuts both in favor of and against the appellant's allegation of CA bias, does not shift the burden to the government to disprove UCI.

In addition to considering the case for actual UCI, we have considered apparent UCI, asking whether "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Sayler*, 72 M.J. at 423 (citing *Lewis*, 63 M.J. at 415). We find that there are insufficient facts on the record that would lead a reasonable person to harbor significant doubt about the fairness of the proceeding. In possession of the CA's members' selection material, the appellant presented no evidence that the CA selected members by using any criteria other than those found in Article 25, UCMJ. This assignment of error is without merit.

**G. Failure to grant a mistrial**

The appellant avers that the military judge abused her discretion in failing to grant a mistrial. We disagree.

Before the beginning of the trial, the TDC reminded the military judge that the parties had agreed "to reference any testimony from the first trial . . . as 'prior testimony at a prior hearing,' rather than . . . that it was an actual contested trial." The military judge agreed:

> As you stated, we—our goal is to preclude any indication to
> the members that there was a previous court-martial. And, as

indicated, counsel should refer to any prior testimony as something of the nature of, "At a prior hearing," or, "During prior testimony," something of that nature, and not refer to a court-martial.[35]

During trial, the government called Dr. B, an expert in radiology. On re-direct examination, the prosecutor asked Dr. B if he had reviewed certain x-rays on the high resolution monitors at his office before trial. Dr. B responded, "Not for this particular trial. I did for the original trial."[36] The military judge quickly excused the members and discussed issuing a curative instruction with the parties. The defense refused to participate in the drafting of the curative instruction and asked for a mistrial. The military judge denied the mistrial and provided the members with the following curative instruction:

> Members, you are to completely disregard Dr. [B's] statement concerning a prior proceeding. There are many ways and reasons why a prior proceeding that may have occurred could've terminated. And you may make no inference concerning the guilt or innocence at [sic] the accused. You are to determine the accused's guilt or innocence based solely on the evidence presented to you in court. Is there any member who cannot follow this matter?[37]

All of the members indicated that they could follow the instruction. The military judge gave the appellant the overnight recess to draft a written motion for mistrial. The defense filed the written motion the next morning, which the military judge denied. In her ruling, the military judge pointed out that Dr. B mentioned only that there was a prior trial—not a prior conviction—and that the defense failed to provide any source of law for the proposition that such a statement was worthy of a mistrial. The military judge ruled that a curative instruction was the appropriate remedy.

> [T]here were multiple and various inferences the members could draw if permitted to make inferences regarding the mere mention of a previous trial. That is exactly why I deemed a curative instruction to be the appropriate remedial action to stop as quickly as possible the members from making any infer-

---

[35] Record at 80.

[36] *Id.* at 647.

[37] *Id.* at 664.

ences. I do not agree with the defense that the only acceptable curative instruction would require lying to the members.[38]

"We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion." *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009) (citing *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990)). A military judge "may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). But "a mistrial is an unusual and disfavored remedy. It should be applied only as a last resort to protect the guarantee for a fair trial." *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003). "A curative instruction is the preferred remedy, and the granting of a mistrial is an extreme remedy which should only be done when 'inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.'" *Id.* at 92 (quoting R.C.M. 915(a), Discussion).

Here, we find the military judge did not abuse her discretion by denying the request for a mistrial. We do not believe the mere mention of a previous trial by Dr. B casts substantial doubt upon the fairness of the proceedings. *See* R.C.M. 915(a). The doctor's comment was not so prejudicial that a curative instruction did not cure it. In fact, the curative instruction alleviated any possible prejudice that might have arisen. We presume "absent contrary indications, that the panel followed the military judge's instructions." *United States v. Sewell*, 76 M.J. 14, 19 (C.A.A.F. 2017).

## H. The government taking the appellant's uniforms

The appellant claims he was unlawfully punished under Article 13, UCMJ, when the government kept his uniforms after his first conviction was overturned and he was released from the brig. We disagree.

Before findings, the appellant made an oral Article 13, UCMJ, motion alleging illegal pretrial punishment. The appellant testified that he was required to turn in his uniforms when he entered confinement after his first court-martial. He was then ordered back to active duty when his convictions were set aside. The appellant testified that he then bought $400.00 worth of new uniforms because none of the command's spare uniforms fit him. The military judge denied the motion because she found no punitive intent by the command to punish the appellant, and "multiple legitimate[,] non-punitive

---

[38] *Id.* at 671.

government interests" for taking uniforms from servicemembers receiving a dishonorable discharge.[39]

Article 13, UCMJ, prohibits pretrial punishment: "[n]o person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him[.]" The CAAF has determined that for the appellant to receive relief, he must show that the government intended to punish him. "[T]he question of whether particular conditions amount to punishment before trial is a matter of intent, which is determined by examining the purposes served by the restriction or condition, and whether such purposes are reasonably related to a legitimate governmental objective." *Howell v. United States*, 75 M.J. 386, 393 (C.A.A.F. 2016) (quoting *United States v. Palmiter,* 20 M.J. 90 (C.M.A. 1985)) (alteration in original) (internal quotation marks omitted).

"The burden is on [the] appellant to establish entitlement to additional sentence credit because of a violation of Article 13[, UCMJ]." *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citing R.C.M. 905(c)(2)). Whether an appellant is entitled to relief for a violation of Article 13, UCMJ, is a mixed question of law and fact. *Id.* (citing *United States v. Smith*, 53 M.J. 168, 170 (C.A.A.F. 2000) and *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)) (additional citation omitted). "We will not overturn a military judge's findings of fact, including a finding of no intent to punish, unless they are clearly erroneous. We will review *de novo* the ultimate question whether [this] appellant is entitled to credit for a violation of Article 13[, UCMJ]." *Id.* (citing *Smith*, 53 M.J. at 170).

Here, the appellant presented no evidence that the government acted with a punitive intent when it appropriated his uniforms after his first conviction. Accordingly, the military judge found no intent to punish: "[T]here does not appear to be any punitive intent in the lack of retention of [the appellant's] uniforms while he was in the brig, or those items being returned to him."

The military judge also found legitimate, nonpunitive purposes for the government's policy of confiscating uniforms of servicemembers who had received punitive discharges. Those reasons included: (1) preventing servicemembers who had received punitive discharges from wearing their uniforms out in town; (2) complying with the Naval Military Personnel Manual's requirement for persons with punitive discharges to surrender their uniforms;[40]

---

[39] *Id.* at 1089-90.

[40] MILPERSMAN, Art. 1910-228, p.1 (CH-11, 1 Jun 2005).

and (3) compliance with 10 U.S.C. § 771a's requirement that when an enlisted servicemember is discharged dishonorably his issued clothing must be retained by the military.[41]

The military judge's findings of fact are supported by the record and are not clearly erroneous. Her conclusions of law are correct. Accordingly, we find that the appellant is not entitled to relief under Article 13, UCMJ.

### III. CONCLUSION

The findings and sentence as approved by the CA are affirmed.

Chief Judge WOODARD and Senior Judge FULTON concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court

---

[41] Record at 1089-90.