*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Isiah Anthony P. CAUSEY**
Aviation Boatswain's Mate (Aircraft Handler) Airman (E-3),
U.S. Navy
*Appellant*

**No. 202000228**

_____

Argued: 11 January 2022—Decided: 23 March 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Ann K. Minami (arraignment)
Kimberly J. Kelly (trial)

Sentence adjudged 19 June 2020 by a general court-martial convened at Naval Base Kitsap-Bremerton, Washington, consisting of officer and enlisted members. Sentence in the Entry of Judgment: confinement for one year and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Megan P. Marinos, JAGC, USN*

For Appellee:
*Lieutenant John L. Flynn IV, JAGC, USN* (argued)
*Major Clayton L. Wiggins, USMC* (on brief)

Judge MYERS delivered the opinion of the Court, in which Senior Judge GASTON and Judge HOUTZ joined. Senior Judge GASTON filed a separate concurring opinion.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

MYERS, Judge:

Contrary to his pleas, Appellant was convicted by officer and enlisted members of three specifications of Article 80, Uniform Code of Military Justice [UCMJ], for attempted sexual abuse by communicating indecent language to "Mackenzie," whom he believed to be a child who had not attained the age of 16 years; attempted sexual abuse by intentionally exposing his genitalia to her; and attempted wrongful receipt of child pornography by requesting that Mackenzie send him digital images of her exposed genitalia and other sexually explicit conduct.

Appellant asserts five assignments of error [AOEs]: (1) the military judge abused her discretion when she denied Appellant's request for expert assistance; (2) the military judge abused her discretion when she denied Appellant's request for an expert witness; (3) the trial counsel committed prosecutorial misconduct during his closing and rebuttal arguments by expressing his personal opinion of the evidence and disparaging the defense counsel's argument; (4) the trial counsel committed prosecutorial misconduct during his sentencing argument by telling the members not to consider properly admitted evidence, to consider facts not in evidence, and to give a sentence based on something other than the specific facts of the case; and (5) in light of *Ramos v. Louisiana*,[1] a military defendant has the right to a unanimous verdict in a criminal trial by court-martial. We find no prejudicial error and affirm.

## I. BACKGROUND

In February 2019, using the profile, "IsiahAnthony," Appellant sent a message on an online social network to "Mack," whose profile indicated the user was 18 years old. Several short messages were relayed between "Mack" and

———————————

[1] *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020).

"IsiahAnthony" over the course of the next 13 days, until "Mack," also known as "Mackenzie" and "Mackigurl6," requested that Appellant use a different chat application. Appellant obliged. In these further chats, "Mackenzie" stated, "I should prob tell u. Imma little younger than my profile says."[2] After Mackenzie informed Appellant that she was 13 years of age, Appellant responded, "Ok yeah we can't talk I'm 22 . . . I can't risk getting in trouble sense ur a teenage and I'm 22 years old."[3] Mackenzie replied, "Okk I understand," but Appellant continued the chat by stating, "Ur 13 I'm 22 anyone found out I'd go to jail," and "Ok how do ik this ain't a set up of some sort," followed by "Like ever heard of to catch a predator."[4] Thereafter, despite Mackenzie's professed age, Appellant continued to chat with her, informing her that he was masturbating. He then requested nude photographs from her and sent her a photograph of his erect penis. He also articulated the sexual acts he wanted to engage in with the purported minor, to include ejaculating on her face and having anal sex with her.

Mackenzie was in fact Special Agent [SA] Sienna Echo[5] with the Naval Criminal Investigative Service [NCIS], engaged in a proactive child exploitation investigation. Approximately one week after Appellant's online conversation with Mackenzie, SA Echo interviewed Appellant, who acknowledged that he had communicated online with a 13-year-old girl named Mackenzie. He stated that due to alcohol consumption he could not recall the entirety of his online conversation with Mackenzie, but admitted that he did remember some details. During the interview, SA Echo did not inform Appellant that she was Mackenzie and maintained the pretense that Appellant had been speaking with a 13-year-old child, and at no point during the interview did Appellant claim or otherwise give any indication that he believed Mackenzie was an adult at the time of the online conversations. Appellant expressed remorse for his behavior and wrote the fictitious Mackenzie's parents a letter of apology.

---

[2] Pros. Ex. 1 at 1.

[3] *Id.*

[4] *Id.*

[5] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

## II. DISCUSSION

### A. Request for Expert Assistance

Appellant asserts that the military judge abused her discretion in denying Appellant's pretrial motion for expert assistance in the area of forensic linguistics. We review a military judge's ruling on a request for expert assistance for abuse of discretion.[6] The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—the challenged action must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous."[7]

A request for expert assistance must show a reasonable probability that the expert would be of assistance to the defense (i.e., that the expert is necessary), and that denial of the expert assistance would result in a fundamentally unfair trial.[8] To demonstrate necessity, the request must show (1) why the expert is needed; (2) what the expert assistance will accomplish; and (3) why the defense would be unable to gather and present the evidence that the expert assistance would be able to develop.[9]

Appellant's motion to compel the assistance of a forensic linguist was predicated on the notion that Appellant "naturally recognized his chat partner was an adult, outside of his own generation . . . based on characteristic linguistic differences that exist between all generations, and which are difficult to mimic unnoticed."[10] Appellant argued that in order to explain why he believed Mackenzie was an adult at the time of the online conversations, he required expert assistance in linguistics to "analyze text to identify the linguistic flags that alert in-generation members to an imposter."[11]

The military judge denied Appellant's request, concluding that it failed to show the necessity of the requested expert. She reasoned that the factual issue to be resolved at trial was the accused's state of mind while he was engaged in chats with Mackenzie, on which the expert's knowledge and opinion regarding linguistic patterns had no bearing. In support of this view, the military judge

---

[6] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010).

[7] *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

[8] *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008).

[9] *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994).

[10] App. Ex. IV at 1.

[11] *Id.* at 2.

cited Appellant's affidavit, submitted in support of the motion, in which he stated that due to intoxication he had no recollection of his belief regarding Mackenzie's age at the time of the alleged offenses. The military judge also noted that during his online chats with Mackenzie, Appellant never expressed any belief that he was speaking with an adult. She reasoned that "[Appellant's] inability to state with any certainty his actual belief or lack thereof regarding 'Mackenzie's' age at the time of the alleged offenses and the lack of any other evidence that he believed her to be an adult significantly attenuate any possible relevance of [the expert linguist's] expertise and therefore any reasonable probability that his expertise will both be of assistance and is required for a fair trial."[12] She therefore concluded that "far from assisting the Defense in elucidating [Appellant's] state of mind, [the expert's] expertise creates confusion by shifting focus away from [Appellant's] state of mind, i.e., the fact at issue, to [the expert's] ability as a forensic linguist to defeat the efforts of a given writing's author to mask her identity."[13] Finally, she found that Appellant and his defense counsel had the tools to develop this defense without the assistance of an expert.

Appellant's arguments before this Court again miss the mark. An expert consultant hired for the purpose of discerning the likely age of Mackenzie based on linguistics found in her texts was irrelevant to the issue before the trial court, which was not the "real" age of Mackenzie, but whether Appellant believed her to be a 13-year-old child. Appellant did not make the requisite showing of necessity at the trial court, we find the military judge's findings of fact are supported by the evidence and not clearly erroneous, and we do not find her ruling to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. We therefore find no abuse of discretion in her denial of the motion for expert assistance.

## B. Request for Expert Witness

Appellant asserts that the military judge also abused her discretion in denying his motion for an expert witness in the field of forensic linguistics. We review a military judge's denial of an expert witness for abuse of discretion.[14]

---

[12] App. Ex. XVII at 7.

[13] *Id.*

[14] *United States v. Ruth*, 46 M.J. 1, 3 (C.A.A.F. 1997).

The standard for production of an expert witness is more stringent than the standard for producing an expert consultant. In seeking to compel an expert witness, the defense must show the witness is relevant and necessary.[15] To meet this standard, pursuant to *United States v. Houser*, the defense must establish the expert's qualifications, the propriety of the subject matter of the expert's expected testimony, the basis for the testimony, the legal relevance of the evidence, and the reliability of the evidence.[16] It must also pass the Mil. R. Evid. 403 balancing test regarding whether the probative value of the testimony outweighs other considerations.[17]

Here, several months after the military judge denied its motion for an expert consultant in the field of forensic linguistics and 13 days before trial, the Defense moved to compel the same expert consultant as an expert witness. Other than the convening authority's written denial of its expert witness request, the Defense did not submit any additional evidence beyond what had been submitted in the earlier motion for an expert consultant. The Defense again argued its theory that Appellant believed he was communicating with an inartful mimic, based on inherent linguistic differences between all generations, and that the expert linguist's testimony was critical to the issue of Appellant's subjective belief about Mackenzie's age at the time of his chats with her. However, in the same affidavit submitted in support of the motion for an expert consultant,[18] Appellant stated that due to intoxication he had no recollection of his belief regarding Mackenzie's age at the time of the offense and that only when reviewing the chat transcript did he conclude that Mackenzie did not sound like his younger siblings, nieces, and nephews, such that he would never have believed her to be 13 years old.

The military judge denied the motion, concluding that the expert's proposed testimony was neither material nor necessary. She properly applied the factors outlined in *Houser*, finding that the expert's testimony would be of minimal probative value, which was substantially outweighed by the danger of confusing the issues and misleading the members. She again determined that the question before the members was not whether the expert could determine the "true" age of Mackenzie based on linguistic patterns in the chat logs, nor whether the language used within the chats raised red flags or concerns for the expert regarding her age; rather, it was whether Appellant, a then-22-year-old

---

[15] Rule for Courts-Martial [R.C.M.] 703(d)(2)(A)(i); *United States v. Rivers*, 49 M.J. 434, 446 (C.A.A.F. 1998).

[16] *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993).

[17] *Id.*

[18] App. Ex. IV, Encl. F. at 1.

Sailor with no training in linguistics, believed Mackenzie was a 13-year-old child at the time of the chats. The military judge found the expert's testimony would not assist the trier of fact in determining Appellant's state of mind at the time of the chats, since

> [a]t most, he indicated he would be able to say that the closer in age one is to a certain age group, i.e., 13-year-olds, and the more exposure one has to communications of that age group, the more likely one would be to detect (even unconsciously) someone mimicking the age group. A statement of the obvious does not "help the trier of fact to understand the evidence or to determine a fact in issue."[19]

The military judge further found that evidence supportive of the Defense's theory could be introduced through alternative means, such as cross-examination of SA Echo or, if he sought to introduce direct evidence regarding his state of mind, Appellant's own testimony.

We find that the military judge did not abuse her discretion in denying the motion to compel the expert witness. Appellant argues that his trial defense team needed to be able to cross-examine SA Echo regarding every word or phrase she used during her communications with Appellant, and to further show why certain language was not age-appropriate for a purported 13-year-old. But, like the military judge, we find this argument misses the point. The issue is not whether Mackenzie was in fact a 13-year-old girl (which was conceded not to be the case—she was an adult NCIS agent), but whether Appellant did or did not believe she was 13 years old at the time he communicated with her. Based on the evidence before this Court, the evidence regarding that subjective belief would not have been informed by the testimony of an expert in linguistics about how in his opinion the language used in the chats was or was not typical of the language used by an actual 13-year-old.

## C. Trial Counsel's Comments During Closing and Rebuttal Arguments

Appellant contends that the trial counsel committed prosecutorial misconduct by using the pronoun "we" and the phrase "we know" during his closing and rebuttal arguments, disparaging the defense counsel's theme and theory, and injecting his personal views of the evidence and Appellant's guilt. We review improper argument de novo and if no objection is made, we review for plain error. The three-part test for plain error is: (1) was there error; (2) was it

---

[19] App. Ex. XXXIV at 3 (quoting Mil. R. Evid. 702(a)).

plain or obvious; and (3) was there material prejudice to a substantial right.[20] When there is an objection at trial, we test any error for material prejudice to the appellant's substantial rights.[21] Challenged argument is reviewed not based "on words in isolation, but on the argument viewed in context" and "within the context of the entire court-martial.[22]

### 1. Using the Pronoun "We" and the Phrase "We Know"

Appellant argues that the trial counsel's use of word, "we," and the term, "we know," constituted improper vouching. We disagree.

"Improper vouching *can* include the use of personal pronouns in connection with assertions that a witness was correct or to be believed."[23] Examples of such improper vouching include saying, "I think it is clear, I'm telling you, and I have no doubt,"[24] "[w]e all know [the victim] didn't make this up," "[w]e all know [the accused] lied on the video," "[w]e know [the accused's conduct] wasn't accidental," and "[w]e know this was not the actions [sic] of an innocent man."[25] Our superior court has also found improper vouching where the trial counsel argued "we know that that was from an amount that's consistent with recreational use, having fun and partying with drugs" in conjunction with arguing that the drug test results were the "perfect litigation package" and that the government's expert witness was "the best possible person in the whole country to come speak to us about this."[26]

However, "the use of personal pronouns in closing argument is not per se a due process violation," and the "key issue is not the form but the content of such statements."[27] "[T]he prosecutor's closing argument need not be confined

---

[20] *United States v. Norwood*, 81 M.J. 12, 19–20 (C.A.A.F. 2021) (quoting *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011)).

[21] *Id.* at 19 (citing *United States v. Voorhees,* 79 M.J. 5, 9 (C.A.A.F. 2019)).

[22] *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citing *United States v. Young*, 470 U.S. 1, 16 (1985)) (internal quotation marks omitted).

[23] *United States v. Fletcher*, 62 M.J. 175, 180 (C.A.A.F. 2005) (internal citation omitted) (emphasis added).

[24] *Id.*

[25] *United States v. Sewell*, 76 M.J. 14, 20 (C.A.A.F. 2017).

[26] *Fletcher,* 62 M.J. at 180.

[27] *United States v. Veater*, 576 Fed. Appx. 846, 853 (10th Cir. 2014) (unpublished) (internal quotation marks and citation omitted).

to such detached exposition as would be appropriate in a lecture."[28] "An attorney's statements that indicate his opinion or knowledge of the case are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence."[29]

Here, the trial counsel's use of pronouns was clearly directed toward urging conclusions to be drawn from the evidence:

> So, members, let's talk about the investigation. We know it began as an operation, an undercover operation. Special Agent [Echo] testified about how this operation got put together . . . .[30]
>
>     . . . .
>
> That shows that the idea for each one of those offenses that's charged originated with Airman Causey. The defense of entrapment exists only if the original suggestion and initiative to commit the offense originated with the government. Here we know it did not.[31]
>
>     . . . .
>
> So next is the sexual abuse of a child by exposing genitalia. This similar element, he had to intend to expose his genitalia, which again, we know that was not—had he taken a picture of his penis and he meant to send it to somebody else, maybe that would be an issue, but he sends it to her. And we know he intended to send it to her because he follows it up with "I bed [sic] you want to feel that in your p[***]." So we know that was a specific act that he intended and, again, that he intended it to someone under. So we know that because then he describes all the things that he would do with that penis were they in person.[32]

---

[28] *United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006) (quoting *United States v. Isaacs*, 493 F.2d 1124, 1164 (7th Cir. 1974)).

[29] *United States v. Scilluffo*, No. ACM 39539, 2020 CCA LEXIS 62, *62–63 (A.F. Ct. Crim. App. March 4, 2020) (unpublished) (citing *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978); *United States v. Rivas*, 493 F.3d 131, 137 (3d Cir. 2007); *United States v. Beaman*, 361 F.3d 1061 (8th Cir. 2004); and *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)).

[30] R. at 567.

[31] R. at 570.

[32] R. at 573.

. . . .

So if we go to these charges, we know that we have the actual acts. We have the language. We have the picture of his genitals, which I don't have a slide for that. We have the request for child pornography, the request that she make it and send it to him.[33]

. . . .

So just at large, I can't go shoot somebody and then say, "Well, I was drunk," and then everyone just says that's fine. Right? So if I have to form the specific intent, that's required mentally, which we know Airman Causey did because he was communicating clearly. There were not typos. He was specifically requesting things. There's actually no evidence, aside from him saying "I'm drunk" that there was.[34]

. . . .

So his general disposition to try and dodge accountability shows, because we know he knew exactly what was going on, he's just trying to come up with a way to avoid admitting that he knows the content of these messages. You know why we know? Because there were some things that they showed him and he said, "Yeah, that looks familiar. Yes, I do remember that."[35]

. . . .

He says, "Why didn't I just freaking look at porn? I don't f[***]ing know." But, members, we know that his browsing history shows he was actually looking at porn.[36]

. . . .

What is reasonable to believe is that when he says "I was trying to finish masturbating, I was trying to entice her," that he actually meant that, because we know he was masturbating. We know he wanted pictures. So you put yourself in the mind of the

---

[33] R. at 575.

[34] R. at 576.

[35] R. at 577–78.

[36] R. at 579.

accused and if, at that moment, he believed he was talking to a 13-year-old girl, he's guilty.[37]

We decline to expand *Fletcher's* holding to encompass such use of pronouns, which is properly focused on drawing reasoned conclusions from the evidence in the record, as opposed to expressing personal opinions regarding the credibility of witnesses or other evidence. Therefore, while nevertheless cautioning practitioners regarding their use, we find the trial counsel's use of personal pronouns in this case was not improper.

### 2. Injecting Personal Views of the Evidence and Appellant's Guilt

Appellant further contends that the trial counsel made improper arguments by stating the following:

> The only time that we have evidence that he was, in fact, drinking is because he's trying to come up with a reason to say "I don't remember any of this." And members, it is not compelling. So we are going to talk about how you know he's lying. [38]
>
> . . . .
>
> So you put yourself in the mind of the accused and if, at that moment, he believed he was talking to a 13-year-old girl, he's guilty. And, members, he is, beyond all reasonable doubt.[39]
>
> . . . .
>
> So members, reason. Is it reasonable to think that someone who at no point says, "I thought she was 18" actually thought she was 18? Members, that's not reasonable.[40]
>
> . . . .
>
> You can have speculative doubts, but there are no reasonable doubts before you, members. There is not one reasonable doubt. It is not reasonable to believe that in the face of all the evidence against the accused, . . . never once telling law enforcement, when questioned about whether he committed this crime, that he thought she was 18. It is not reasonable to believe that that

---

[37] R. at 604.

[38] R. at 576.

[39] R. at 604.

[40] R. at 603.

person actually thought so. What is reasonable is to believe is that when he says "I was trying to finish masturbating, I was trying to entice her," that he actually meant that . . . .[41]

We find no merit in Appellant's claims that these statements constitute improper argument. The trial counsel referenced the proper legal standard for reasonable doubt and applied the facts in evidence and the reasonable inferences derived therefrom. He provided proper argument regarding why the evidence met the elements of the charged offenses beyond a reasonable doubt, and why that same evidence proved the lack of an affirmative defense beyond a reasonable doubt.

### 3. *Disparaging Appellant's Theme and Theory*

The Defense's theme at trial was that the online chat with Mackenzie was "one big 'con'—a series of lies."[42] The defense counsel even suggested the court-martial itself was a "con"[43] and referred to the case as a "con" 14 times in his closing argument.[44] The trial counsel responded to this theme during his rebuttal argument, stating, "Members, this court-martial is not a con. This is a very formal proceeding. It's very serious . . . . *I apologize* for a reference that what you're doing here is a con."[45] The defense counsel objected, and the military judge directed the trial counsel to move on.

Appellant asserts the trial counsel's response was improper and constitutes error. The Government concedes that the trial counsel improperly disparaged Appellant's theme during rebuttal, but argues Appellant was not prejudiced given the comment's minimal impact and the overall strength of the Government's case.[46] We find the initial statements—"Members, this court-martial is not a con. This is a very formal proceeding. It's very serious . . . ."—to be non-objectionable rebuttal. However, the last sentence wherein the trial counsel apologizes to the members is improper because it injects the trial counsel into the proceeding by purporting to shield the members from the defense counsel's perceived affront to the solemnity of the proceedings. Such an apology may also

---

[41] R. at 603–04.

[42] Appellant's Br. at 21.

[43] R. at 580

[44] R. at 580, 592–93, 595.

[45] R. at 595 (emphasis added).

[46] Gov't Ans. at 35.

be viewed as an attempt to gain favor with the members by aligning the trial counsel with the members against the defense counsel, which could turn the trial into a popularity contest, rather than a means of deciding the case "solely on the basis of the evidence presented."[47] A court-martial is not an extension of trial counsel, and it was error for the trial counsel to use an apology to suggest otherwise. We therefore find the military judge properly stopped the trial counsel from making further comments of this sort.

*4. Prejudice*

Because we found error in the trial counsel's "apology," we test for prejudice. Material prejudice occurs where there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different."[48] In making this determination, we evaluate the improper argument's severity, the curative measures adopted, and the weight of the evidence supporting the conviction.[49] "[T]he third factor may so clearly favor the government that the appellant cannot demonstrate prejudice."[50] "[R]eversal is warranted only when the trial counsel's comments taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone."[51]

Here, "[e]ven assuming that trial counsel's misconduct was severe and the military judge's instructions were insufficient, we find the third *Fletcher* factor dispositive in this case."[52] The evidence supporting Appellant's convictions is decidedly strong. From sending "Mackenzie," a law enforcement agent posing as a 13-year-old girl, pictures of his exposed penis, to asking for images of her "t[***], a[***][, and] p[***]," to talking about masturbating while communicating with her, to expressing remorse to NCIS and Mackenzie's "parents," we

---

[47] *Fletcher*, 62 M.J. at 181 (*Young*, 470 US at 18)

[48] *Norwood*, 81 M.J. at 20 (internal quotation marks and citation omitted).

[49] *Id.* at 19 (quoting *Voorhees*, 79 M.J. at 12).

[50] *Sewell,* 76 M.J. at 18; *see also United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (holding the same for improper argument during sentencing).

[51] *Sewell,* 76 M.J. at 18.

[52] *Id.* at 19 (where victim testimony and the appellant's admissions overcame any potential prejudice by improper argument); *see also United States v. Hornback*, 73 M.J. 155, 161 (C.A.A.F. 2014) (where the testimony of two witnesses who observed the appellant smoking an illicit substance was strong enough to override the absence of a drug test and pervasive improper character argument that the appellant was a drug user).

cannot say that "counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted [A]ppellant on the basis of the evidence alone."[53] We therefore find that the apology made by trial counsel was improper, but that this error was not prejudicial.

**D. Trial Counsel's Comments During Sentencing Argument**

Appellant asserts that the trial counsel also gave improper sentencing argument by suggesting that the members not consider the fact that there was no child victim, that Appellant needed to be confined for three years to ensure he received proper treatment, and that his sentence should be adjudged based on how it would appear in a news headline. He argues that the cumulative impact of this misconduct resulted in material prejudice to Appellant's substantial rights. We address each in turn and find some error, but no prejudice.

*1. Argument That Appellant Should Not Receive a "Windfall" Because There Was No Actual Child Victim*

Trial counsel are allowed to recommend a specific sentence and can argue a host of factors including the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.[54] Here, Appellant was convicted of *attempted* child sexual abuse. The fact that no child was actually victimized is part and parcel of the offense for which Appellant was to be sentenced. Under these circumstances, we hold that the trial counsel's argument that Appellant should not get a "windfall" because there was no actual victim fell within the bounds outlined in the Rules for Courts-Martial and was not improper.

*2. Argument Regarding Hypothetical Newspaper Scenario*

Improper sentencing argument has been found where the trial counsel "pressured the members to consider how their fellow servicemembers would judge them and the sentence they adjudged instead of the evidence at hand."[55] "Trial counsel may properly ask for a severe sentence, but they cannot threaten the court members with the specter of contempt or ostracism if they reject their request."[56] "Arguing an inflammatory hypothetical scenario with no basis in

---

[53] R. 360–495; Pros. Exs. 1–2, 4–7; *Norwood*, 81 M.J. at 19.

[54] R.C.M. 1001(h), 1002(f)(3).

[55] *Norwood*, 81 M.J. at 21.

[56] *Id.* (internal quotation marks and citation omitted).

evidence amounts to improper argument" that our superior court has repeatedly condemned.[57] However, trial counsel may argue that a sentence needs to "promote adequate deterrence of misconduct."[58]

Here, the trial counsel stated:

> when . . . this information, the results of today's sentencing, gets to the fleet, if we were to read E-3 from *Carl Vinson* found guilty of attempted sexual abuse of a child for attempting to receive child pornography from her by requesting that she make it, and that Sailor received blank as punishment, when you read that, what number in your head would you say "that seems right, that seems appropriate"? And if you wouldn't read that and say, "that seems like the right outcome," do not vote for that sentence. Don't even propose it. If you know that you would not be comfortable reading that, that should not be a discussion for what is an appropriate sentence.[59]

There was no objection to this argument. However, the military judge did subsequently issue the following general instruction:

> [m]embers, [the trial counsel] touched on this, but while deterrence is one appropriate consideration, you do need to impose a sentence appropriate to the specific offenses of which the accused has been convicted, namely violations of Article 80, which is attempt. Also, appropriate to this particular accused and appropriate to the specific facts of this case.[60]

We find no plain error under these circumstances. The trial counsel asked the members to imagine what *they* would think of the sentence they proposed if *they* read it in the newspaper, as opposed to what *other servicemembers* would think. We further find that any implied or potential consideration of what others would think upon reading about the sentence the members imposed in a newspaper, as well as any concern that general-deterrence considerations would cause the members to disregard the specifics of the case in front of them, were cured by the military judge's appropriate, tailored instruction.

---

[57] *Id.* ( citing *Voorhees*, 79 M.J., at 14–15).

[58] R.C.M. 1002(f)(3)(d); *See* R.C.M. 1001(h).

[59] R. at 708–09.

[60] R. at 712.

*3. Argument Regarding Collateral Consequences*

"Although military judges and members should not generally consider collateral consequences in assessing a sentence, this is not a bright-line rule," as sometimes "it may be appropriate for the military judge to instruct on collateral matters."[61] "For example, the availability of parole and rehabilitation programs are issues of general knowledge and concern, and as such they may be instructed upon, especially when requested by the members."[62] However, in those situations, "the military judge should then instruct the members that although the possibility of parole exists in the military justice system, they could not consider it in arriving at an appropriate sentence for the appellant."[63]

Here, the trial counsel gave the following argument:

> Dr. [Juliet] explained how in his in-depth psychosexual analysis, he concluded, an expert in forensic psychology, that Airman Causey needs treatment. He needs rehabilitation. He needs treatment in impulse control. We're rewiring how he responds to certain stimulus. That takes time. He needs treatment in substance abuse and in victim impact awareness. This is basic empathy. That takes time to develop. And so we need to put Airman Causey in a place where he can receive sex offender treatment. So the Government, for that reason additionally, is requesting these 3 years of confinement, because he has not learned his . . . lesson.[64]

The defense counsel objected on grounds that the argument was an improper reference to collateral consequences and that it was not based on any evidence presented. The military judge sustained the objection.

While we agree the argument was improper, as there was no evidence regarding sex offender treatment programs or timelines, it was immediately the subject of a sustained objection, at which point the improper argument ceased. Further, as previously discussed, there was significant aggravating evidence against Appellant. The Government asked for three years' confinement and a dishonorable discharge; Appellant's trial defense counsel asked the members

---

[61] *United States v. McNutt*, 62 M.J. 16, 19 (C.A.A.F. 2005) (internal quotation marks and citation omitted).

[62] *Id.*

[63] *Id.*

[64] R. at 707–08.

to sentence Appellant to only a bad-conduct discharge; and the members ultimately sentenced him to confinement for one year and a dishonorable discharge. Under these circumstances, we find that Appellant was not prejudiced by the improper argument.

**E. The Right to Unanimous Verdicts at Courts-Martial**

Finally, Appellant challenges his conviction on the grounds that Article 52, UCMJ,[65] which does not require a unanimous verdict for non-capital convictions, is now facially unconstitutional in light of the Supreme Court's decision in *Ramos v. Louisiana.*[66] We review constitutional issues de novo.[67]

The Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."[68] The Supreme Court has long held that the right to "trial by an impartial jury," as applied to criminal trials in Article III courts, requires a unanimous verdict in order to convict a defendant of a serious crime.[69] More recently, in *Ramos*, the Supreme Court held that the same right, requiring a unanimous verdict, also applies via the Fourteenth Amendment to criminal trials conducted in state courts.[70]

Appellant argues that under *Ramos*, the Sixth Amendment right to unanimous verdicts now applies to courts-martial. We disagree. As the Supreme

---

[65] Article 52, UCMJ, provides that in a general or special courts-martial with members, the concurrence of at least three-fourths of the members present when the vote is taken is required to reach guilty findings and a sentence, except in capital cases, in which unanimity is required for both the findings and the sentence.

[66] 7Although *Ramos* was decided several months prior to the start of Appellant's trial, Appellant's trial defense counsel did not challenge the constitutionality of Article 52, UCMJ. Our record does not reveal the number of votes for Appellant's conviction. *See* R.C.M. 922(e) (prohibiting polling the members about their voting). However, we consider the constitutionality of the three-fourths requirement because it did apply to this court martial, and we presume that only three-fourths members voted for conviction.

[67] *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012).

[68] U.S. Const. amend. VI (emphasis added).

[69] *Ramos*, ___ U.S. at ___, 140 S. Ct. at 1396–97 ("In all, this Court has commented on the *Sixth Amendment*'s unanimity requirement no fewer than 13 times over more than 120 years.") (citations omitted).

[70] *Id.* at 1394.

Court has repeatedly held, the Constitution recognizes that "the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Article III trials need apply."[71] The Court's jurisprudence in this area stands for the proposition that, while similar now in many ways to state and federal civilian criminal courts,[72] the military justice system is unique and subject to a different degree of constitutional protection than what is afforded in civilian criminal trials.[73]

While it is well established that constitutional safeguards apply to the military "except insofar as they are made inapplicable either expressly or by necessary implication,"[74] our superior court has repeatedly found that the Sixth Amendment right to trial by an "impartial jury of the State and district wherein the crime shall have been committed" is one of the safeguards that does *not* apply to courts-martial.[75] Although there is significant case law regarding empaneling unbiased members in military courts, the law regarding the impartiality of court-martial panels generally derives from R.C.M. 912 and Articles 25 and 41, UCMJ, not from the Sixth Amendment.[76] As *Ramos* does

---

[71] *O'Callahan v. Parker*, 395 U.S. 258, 261 (1969) (overruled on other grounds).

[72] *See Ortiz v. United States*, ___ U.S. ___, 138 S. Ct. 2165, 2170 (2018).

[73] *See Ex parte Milligan*, 71 U.S. 2, 123 (1866) (noting that "the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth" and "[t]he discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts . . . ."); *Ex parte Quirin*, 317 U.S. 1, 40 (1942) ("'[C]ases arising in the land or naval forces' . . . are expressly excepted from the Fifth Amendment, and are deemed excepted by implication from the Sixth"); *Whelchel v. McDonald*, 340 U.S. 122, 127 (1950).

[74] *United States v. Tempia*, 37 C.M.R. 249, 254 (C.M.A. 1967).

[75] *United States v. Riesbeck*, 77 M.J. 154, 162 (C.A.A.F. 2018) ("Courts-martial are not subject to the jury trial requirements of the Sixth Amendment."); *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (same); *United States v. Wiesen*, 57 M.J. 48, 50 (C.A.A.F. 2002) (same); *United States v. Kirkland*, 53 M.J. 22, 24(C.A.A.F. 2000).

[76] *See United States v. Ai*, 49 M.J. 1, 4 (C.A.A.F. 1998) ("[A]n accused in a federal civilian criminal trial has a constitutional right to impartial jury members to determine his guilt. A servicemember similarly has, as a matter of 'fundamental fairness,' the right to impartial court members to decide his guilt. In addition, a military accused has a regulatory right to court members who appear to be impartial.") (citations omitted); *Wiesen*. 57 M.J. at 50 (stating that issues involving who may serve on a court-martial should be viewed through the lens of Article 25, not the *Sixth Amendment* right to trial by jury, which does not apply to courts-martial) (citations omitted). *But see*

not address the military justice system, which is not subject to the *Sixth Amendment* right to trial by an impartial jury, we do not view it as overturning this prior precedent. In any event, it is the prerogative of our superior court, not this one, to overturn its own precedents.[77] Therefore, we hold that the Sixth Amendment's right to trial by an impartial jury, which now requires a unanimous verdict for serious offenses tried in either state or Article III federal criminal courts, is still not applicable to courts-martial.[78]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[79]

The findings and sentence are **AFFIRMED**.

Senior Judge GASTON and Judge HOUTZ concur.

---

*United States v. Lambert*, 55 M.J. 293, 295 (C.A.A.F. 2001) (stating "the *Sixth Amendment* requirement that the jury be impartial applies to court-martial members and covers not only the selection of individual jurors, but also their conduct during the trial proceedings and the subsequent deliberations") (citing R.C.M. 912 and 923 (1995)).

[77] *See United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (quoting *United States v. Quick*, 74 M.J. 332, 343 (C.A.A.F. 2015) (Stucky, J., dissenting)) (stating the well-settled principle of vertical *stare decisis* that "courts 'must strictly follow the decisions handed down by higher courts'"); *United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017) ("It is this Court's prerogative to overrule its own decisions.").

[78] To the extent Appellant argues that unanimous verdicts are also required at court-martial by fundamental fairness under the Fifth and Sixth Amendments, that, too, has been rejected by our superior court. *United States v. Bramel*, 32 M.J. 3 (C.M.A. 1990) (summary disposition).

[79] Articles 59 & 66, UCMJ.

GASTON, Senior Judge (concurring):

I agree with my colleagues that the Sixth Amendment right to "trial by an impartial jury," wherein the Supreme Court has found the right to a unanimous verdict resides, does not apply to courts-martial. The Amendment's further requirement that the jury be drawn from "the State and district wherein the crime shall have been committed" strongly supports the Court's early observation that "the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the [S]ixth [A]mendment, to those persons who were subject to indictment or presentment in the [F]ifth,"[1] which specifically excepts "cases arising in the land or naval forces."[2] The Court's more recent holding in *Ramos v. Louisiana*,[3] that the right to trial by an impartial jury requires a unanimous verdict for a serious offense tried in state court, does not change the Sixth Amendment jury right's settled inapplicability to the military justice system.

But as Chief Judge Crawford of the Court of Appeals for the Armed Forces [CAAF] once noted, "[t]he fact that the *Sixth Amendment* right to trial by jury does not apply to court-martial proceedings . . . does not require us to jettison Supreme Court precedent and good logic in assessing whether [an] appellant was tried by a fair, impartial jury of his superiors."[4] Although a military accused does not possess this right under the Sixth Amendment per se, CAAF has found that "the *Sixth Amendment* requirement that the jury be impartial applies to court-martial members and covers not only the selection of individual jurors, but also their conduct during the trial proceedings and the subsequent deliberations,"[5] which include voting on the findings and sentence. CAAF has also found that "[a]s a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel."[6] And multiple Supreme Court Justices have found that the "requirements of

---

[1] *Ex parte Milligan*, 71 U.S. 2, 123 (1866).

[2] U.S. Const. amend. V.

[3] ___ U.S. ___, 140 S. Ct. 1390 (2020).

[4] *United States v. Wiesen*, 57 M.J. 48, 53 n.2 (C.A.A.F. 2002) (Crawford, C.J., dissenting).

[5] *United States v. Lambert*, 55 M.J. 293, 295 (C.A.A.F. 2001) (citing Rules for Courts-Martial 912 and 913 (1995)).

[6] *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (citation omitted).

unanimity and impartial selection . . . complement each other in ensuring the fair performance of the vital functions of a criminal court jury."[7]

It is therefore worth examining why the Supreme Court regards the right to "trial by an impartial jury" as including the right to a unanimous verdict. As the Court found in *Ramos*, one reason is because when James Madison wrote the Sixth Amendment into the Bill of Rights in 1791, "[i]f the term 'trial by an impartial jury' carried any meaning at all it surely included a requirement as long and widely accepted" as a unanimous verdict, which by that time "had been required for about 400 years."[8] Justice Story later explained that "in common cases, the law not only presumes every man innocent, until he is proven guilty; but unanimity in the verdict of the jury is indispensable."[9] This connection between unanimous verdicts and the presumption of innocence has also been viewed as implying a further connection with proof of guilt beyond a reasonable doubt, which the Court held is required by due process as "a prime instrument for reducing the risk of convictions resting on factual error."[10] As Justice Kavanaugh reasoned in *Ramos*, allowing state criminal courts to use non-unanimous verdicts "sanctions the conviction at trial . . . of some defendants who might not be convicted under the proper constitutional rule [requiring unanimity] . . . ."[11]

While the Supreme Court has recognized that "[t]he procedural protections afforded to a service member are 'virtually the same' as those given in a civilian criminal proceeding, whether state or federal,"[12] the use of non-unanimous verdicts at courts-martial remains one of their "fundamental differences from the practices in the civilian courts."[13] In fact, the military justice system, which the Court has noted is "older than the Constitution,"[14] has never required

---

[7] *Ramos*, 140 S. Ct. at 1418 (Kavanaugh, J., concurring) (quoting *Johnson v. Louisiana,* 406 U. S. 356, 398 (1972) (Stewart, J., dissenting)).

[8] *Ramos*, 140 S. Ct. at 1396.

[9] *Id.* (quoting 2 J. Story, Commentaries on the Constitution of the United States § 777, p. 248 (1833)).

[10] *In re Winship*, 397 U.S. 358, 363 (1970).

[11] *Ramos*, 140 S. Ct. at 1417 (Kavanaugh, J., concurring).

[12] *Ortiz v. United States*, ___ U.S. ___, 138 S. Ct. 2165, 2174 (2018).

[13] *O'Callahan v. Parker*, 395 U.S. 258, 262 (1969) (overturned on other grounds).

[14] *Ortiz*, ___ U.S. at ___, 138 S. Ct. at 2175 (internal quotation marks and citations omitted).

unanimous verdicts in non-capital cases. Early courts-martial were generally decided by a majority vote.[15] When the Uniform Code of Military Justice was enacted after complaints about the unfairness of courts-martial during World War II, the vote requirement for non-capital convictions was increased to two-thirds.[16] In 2016, the vote requirement was changed to three-fourths.[17]

Historically, the reason cited by the Supreme Court for this difference is that "[t]he discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts."[18] While the legislative history is less than clear on this issue, it seems logical that requiring non-unanimous verdicts might reduce deliberation time and the occurrence of hung juries, as compared to systems requiring unanimous verdicts to convict or acquit.[19] The State of Louisiana argued as much in *Burch v. Louisiana* in support of its system of allowing non-unanimous verdicts by six-person juries.[20] However, the Supreme Court rejected the argument in this context. While acknowledging that the State had "a substantial interest in reducing the time and expense associated with the administration of its system of criminal justice," the Court found the benefits that might accrue from such a system, as opposed to one requiring unanimous verdicts, were "speculative, at best," and were at the impermissible cost of threatening "the substance of the jury trial guarantee."[21]

That said, in comparison with the power the States have over their criminal justice systems vis-à-vis the Bill of Rights, Congress has much greater constitutional authority over the military justice system. As the Supreme Court explained in *Weiss v. United States*,

---

[15] W. Winthrop, Military Law and Precedents 377 (2nd ed. 1920) (noting the concurrence of two-thirds was required only to impose a death sentence).

[16] Article 52(a), UCMJ (1950), Ch. 169, § 1, 64 Stat. 125 (repealed 1956, Ch. 1041, § 53, 70A Stat. 641); Manual for Courts-Martial, United States (1951 ed.) [MCM], Ch. XIII, para. 74.d.(3) at 111.

[17] Military Justice Act of 2016, Pub. L. No. 114-328, 130 Stat. 2894 (2016) (codified at 10 U.S.C. § 852).

[18] *Milligan*, 71 U.S. at 123.

[19] Requiring unanimous verdicts only to convict—meaning a lack of unanimity would result in an acquittal—would not cause this problem.

[20] *Burch v. Louisiana*, 441 U.S. 130, 138–39 (1979).

[21] *Id.*

> Congress, of course, is subject to the requirements of the Due
> Process Clause when legislating in the area of military affairs,
> and that Clause provides some measure of protection to defend-
> ants in military proceedings. But in determining what process is
> due, courts must give particular deference to the determination
> of Congress, made under its authority to regulate the land and
> naval forces, U.S. Const., Art. I, § 8.[22]

In light of this strong judicial deference, congressional enactments in the area of military justice are generally upheld unless it can be shown that "the factors militating in favor of [the asserted right] are so extraordinarily weighty as to overcome the balance struck by Congress."[23]

Here, Appellant does not claim that the use of non-unanimous verdicts in the military justice system has the same racially biased origins as their use in the state systems overturned in *Ramos*, but it is worth examining their use at courts-martial through the same lens of equal protection. In *Ramos*, one of the things Justice Kavanaugh found troubling about the state systems' use of non-unanimous verdicts was that they undermined the protections of *Batson v. Kentucky*.[24] In *Batson*, the Supreme Court held that the Equal Protection Clause prohibits racial discrimination in the exercise of peremptory challenges. To combat this, *Batson* requires that if a prima facie case is established that a party's use of a peremptory challenge discriminates against a "cognizable racial group," the party must articulate a race-neutral explanation for the challenge.[25] In Justice Kavanaugh's view, the use of non-unanimous verdicts undermines this *Batson* protection by "[i]n effect . . . allow[ing] backdoor and unreviewable peremptory strikes . . . ."[26] He reasoned that

> non-unanimous juries can make a difference in practice, espe-
> cially in cases involving black defendants, victims, or jurors. . . .
> [N]on-unanimous juries can silence the voices and negate the
> votes of black jurors, especially in cases with black defendants
> or black victims, and only one or two black jurors. . . . The [other]

---

[22] *Weiss v. United States*, 510 U.S. 163, 176–77 (1994) (internal quotation marks and citations omitted).

[23] *Id.* at 177 (quoting *Middendorf v. Henry*, 425 U.S. 25, 44 (1976)).

[24] 476 U.S. 79 (1986).

[25] *Batson*, 476 U.S. at 98.

[26] *Ramos*, ___ U.S. ___, 140 S. Ct. at 1418 (Kavanaugh, J., concurring).

> jurors can simply ignore the views of their fellow panel members
> of a different race or class.[27]

As Justice Marshall succinctly put it, to "fence out a dissenting juror fences out a voice from the community, and undermines the principle on which our whole notion of the jury now rests."[28]

Our superior court has held that, as an aspect of equal protection under Fifth Amendment due process, *Batson*'s prohibition against race-based discrimination in the use of peremptory challenges "applies to courts-martial, just as it does to civilian juries."[29] In so deciding, in a spirit not unlike that of Chief Judge Crawford regarding the Sixth Amendment right to trial by an impartial jury, Chief Judge Everett reasoned that "even if we were not bound by *Batson*, the principle it espouses should be followed in the administration of military justice."[30] *Batson* has since been applied also to prohibit gender-based discrimination in the use of peremptory challenges in both civilian criminal courts[31] and courts-martial.[32] And CAAF judges have repeatedly found that the equal-protection principle *Batson* espouses has broad application to the administration of military justice.[33]

Given this context, Justice Kavanaugh's concerns that the use of non-unanimous verdicts can increase the possibility of unfair or unjust verdicts and the

---

[27] *Ramos*, ___ U.S. at ___, 140 S. Ct. at 1417–18 (Kavanaugh, J., concurring) (citations and internal quotation marks omitted).

[28] *Ramos*, ___ U.S. at ___, 140 S. Ct. at 1418 (Kavanaugh, J., concurring) (quoting *Johnson*, 406 U.S. at 402 (Marshall, J., dissenting)).

[29] *United States v. Santiago-Davila*, 26 M.J. 380, 390 (C.M.A. 1988).

[30] *Id.*

[31] *J.E.B. v. Alabama*, 511 U.S. 127 (1994).

[32] *United States v. Witham*, 47 M.J. 297 (C.A.A.F. 1997) (applying *J.E.B.* to courts-martial).

[33] *See United States v. Bess*, 80 M.J. 1, 20 (C.A.A.F. 2020) (Ohlson, J., dissenting) ("Although *Batson* holds that the Equal Protection Clause 'forbids the prosecutor to challenge potential jurors solely on account of their race,' the constitutional scope of that opinion—if not its literal holding—extends beyond the context of peremptory challenges during voir dire.") (quoting *Batson*, 476 U.S. at 89); *United States v. Dockery*, 76 M.J. 91, 100 (C.A.A.F. 2017) (Sparks, J., concurring) ("[W]hen any member of a suspect class (such as a racial or ethnic group) is improperly removed from the court-martial panel, the constitutional concerns underpinning *Batson* are implicated.").

fencing out of views of minority jurors—which ultimately could be by race, ethnicity, or gender—appear no less applicable to the military justice system than to state criminal justice systems. These factors in favor of unanimous verdicts appear weighty in comparison with the goal of "swifter modes of trial than are furnished by the common law courts," assuming the use of non-unanimous verdicts in courts-martial achieves that goal in some measurable, non-speculative way. However, Justice Kavanaugh's concurring opinion in *Ramos* does not carry the same binding authority as other existing case precedent in this area. Therefore, I agree that we must leave to our superior courts the prerogative of determining whether these (or other) factors are so extraordinarily weighty as to overcome the balance struck by Congress in not requiring unanimous verdicts for the conviction of serious, non-capital offenses tried at courts-martial.[34]

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[34] *See, e.g., United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017) ("It is this Court's prerogative to overrule its own decisions.").